Jones, Plaintiff in error, v. State, Defendant in error.

*No. State 155.  Argued June 2, 1970.—Decided July 1, 1970.*
(Also reported in 178 N. W. 2d 42.)

644

For the plaintiff in error there were briefs and oral argument by *Charles Rowan* of Milwaukee.

For the defendant in error the cause was argued by *Theodore J. Hodan,* assistant district attorney of Milwaukee county, with whom on the brief were *Robert W. Warren,* attorney general, and *E. Michael McCann,* district attorney.

WILKIE, J.   Defendant raises numerous issues concerning testimony admitted as to identity of the defendant which we choose to first consider and which are dispositive of this case.  They are:

1.  Were the Milwaukee pretrial lineups held at such a stage as to entitle defendant to be represented at such lineups by counsel?

2.  If so, was defendant represented at such lineups by counsel?

3.  Under the totality of circumstances were these lineups suggestive and unfair as to the identification of the defendant?

4.  Were court room identifications independent or the direct result of the Milwaukee lineups?

The lineups involved in this case are generally the same as the ones reviewed in *Wright v. State.*[2] The witnesses and the crime are different and some of the details of the St. Elizabeth's Credit Union lineup are different in crucial respects from the American Motors Credit Union lineup examined by this court in *Wright*.

### *Necessity of counsel.*

In *Wright*, wherein the lineup was the same lineup described as the first Milwaukee lineup here, this court decided that "[s]ince the lineup here did take place after the issuance of the warrant, the presence of counsel, or, in the alternative, waiver of counsel, was required." [3]

Here, no such warrant had been issued so this case is controlled by this court's decision in *Hayes v. State,*[4] decided on the same day as *Wright* and involving the right to counsel at a prewarrant lineup.  In *Hayes* we decided that since the matter had reached an accusatorial stage, Hayes was entitled to counsel at the lineup.  The instant matter had also reached such a stage and we think that

---

[2] *Supra,* footnote 1.

[3] *Id.* at page 82.

[4] (1970), 46 Wis. 2d 93, 175 N. W. 2d 625.

under *Hayes,* Jones was entitled to counsel at the Milwaukee lineups.

### Presence of counsel.

Our discussion in *Wright* [5] of the question of whether Jones had counsel at the Milwaukee lineups adequately considers all aspects of that issue and the decision in *Wright* that counsel was provided and present at those lineups is repeated here.[6]

### Suggestiveness of lineup.

This same issue was raised in *Wright.* There we quoted the standard test as to fairness of a lineup from *Stovall v. Denno:* [7] " '. . . a claimed violation of due process of law in the conduct of a confrontation depends on the totality of circumstances surrounding it . . . .' " [8] In *Stovall* the United States Supreme Court recognized that the conduct of identification procedure may be "so unnecessarily suggestive and conducive to irreparable mistaken identification" [9] as to be a denial of due process of law.

In *Wright* we specifically concurred in the trial court's holding that the Milwaukee lineups in that case were fairly conducted.[10]

The record in this case demonstrates that the lineups here were materially different from those approved in *Wright.* At the first Milwaukee lineup in the instant case,

[5] *Supra,* footnote 1, at pages 83-85.

[6] The trial court here correctly held that Jones was represented by an attorney at the Milwaukee lineups.

[7] (1967), 388 U. S. 293, 302, 87 Sup. Ct. 1967, 18 L. Ed. 2d 1199.

[8] *Wright v. State, supra,* footnote 1, at page 86.

[9] *Stovall v. Denno, supra,* footnote 7, at page 302. *See also: Foster v. California* (1969), 394 U. S. 440, 442, 89 Sup. Ct. 1127, 22 L. Ed. 2d 402.

[10] *Wright v. State, supra,* footnote 1, at page 87.

the two defendants were viewed with two other Negro male police officers (both in their thirties) in the presence of several witnesses of both the American Motors Credit Union and the St. Elizabeth's Credit Union robberies. At the time Jones and Wright were identified as individuals involved in the American Motors Credit Union robbery by witnesses (victims of that robbery) standing up and pointing to the defendants. The four employees of the St. Elizabeth's Credit Union made no identifications.

At a second lineup held a few minutes later in which the two defendants and the same two police officers were presented again to the four St. Elizabeth's Credit Union employees, the two defendants were required to put on camel-colored overcoats. We find no reason given in the record for putting this special clothing on the two defendants. No claim is made that the two robbers of the credit union were attired in overcoats at the time of the robbery. At this lineup Heiden identified Jones and Wright and he thereupon stood up and pointed out the defendants.

No other employee of St. Elizabeth's Credit Union identified either defendant at this lineup or when the defendants came back again in a third lineup.

Karen Kane testified that she first reported her identification of Jones in the district attorney's office some minutes after the lineups. She claimed that she had identified him at the first lineup but that she did not step forward to identify him then or when she saw Heiden stand up and point to Jones at the second lineup because she was afraid.

We think that under the totality of circumstances the Milwaukee lineup identification of Jones was unfair and suggestive for two reasons:

1. Jones (and Wright) as presented in the second lineup were clothed in a manner calculated to attract special

attention and to make them stand out from other persons in that lineup.[11]

2. More than one victim of the alleged crime were present at the same time and were permitted to identify Jones in such a way as to influence identification by another person. In this respect we think the conduct of these lineups was quite similar to the lineup procedure criticized in *Gilbert v. California*.[12]

In *Gilbert*, over 100 witnesses were present when Gilbert was brought onto a stage. Many witnesses were victims of numerous other crimes in which Gilbert was a suspect. There was wholesale audible identification of Gilbert by many of the witnesses and in each other's presence. Here the audible identification (accompanied by the physical designation by pointing) of Jones and Wright during the American Motors lineup with several victims of both that robbery and the St. Elizabeth's robbery present, followed by the second lineup where witness Heiden pointed to Jones and identified him as a St. Elizabeth's robber, was unfairly suggestive to the other three victims who were being asked to make identifications. This identification procedure is substantially different than the one approved in *Wright*, where (according to the record in that case) each identifying witness wrote on a piece of paper the number of the person each picked out of the lineup.[13]

The identifications made at the lineup as testified to in these proceedings unquestionably prejudiced the defendant and we must reverse his conviction on this ground.

[11] *See generally: Thompson v. State* (Okla. Crim. 1968), 438 Pac. 2d 287, at page 289.

[12] (1967), 388 U. S. 263, 87 Sup. Ct. 1951, 18 L. Ed. 2d 1178.

[13] *Wright v. State, supra,* footnote 1, at page 86.

*In-court identifications of Jones.*

Even though the Milwaukee lineup identifications of Jones are ruled out, it is still necessary, in view of the new trial at which the issue of identification will again be raised, to consider whether the state-produced, in-court identification testimony was from a source sufficiently independent of the defective lineups.

While both St. Elizabeth's employees Heiden and Kane testified that they identified Jones at the lineups, they also testified to an independent in-court identification of Jones based on an eye defect which they claimed they had noticed at the time the crime was committed. We are thus presented with a situation in which it is to be determined whether this identification has come about by exploitation of the unfair lineup, or " 'by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." [14]

Under this test, such things as the prior opportunity to observe the alleged criminal act, any discrepancy between the pretrial description and the defendant's actual description, identification of defendant by picture prior to the lineup, failure to identify the defendant on a prior occasion and the lapse of time between the alleged act and the lineup identification,[15] are pertinent for this court's consideration.

Both Heiden and Kane were eyewitnesses to the robbery which lasted approximately five minutes. Immediately after the crime, Heiden told the police that he would not be able to identify the participants, but later he gave the police a general description that the robbers were Negro males between 5 and 6 feet tall, and between

---

[14] *Wong Sun v. United States* (1963), 371 U. S. 471, 488, 83 Sup. Ct. 407, 9 L. Ed. 2d 441; *United States v. Wade* (1967), 388 U. S. 218, 241, 87 Sup. Ct. 1926, 18 L. Ed. 2d 1149.

[15] *United States v. Wade, supra,* footnote 14.

twenty and twenty-five years old. Karen Kane said the robbers were Negro males between eighteen and twenty years old. Neither Heiden nor Kane identified the defendant from any photographic source. Neither witness identified Jones at the first lineup although witness Kane later indicated she recognized him immediately upon seeing him. In addition, there was approximately a twenty-six day lapse of time between the robbery and the lineup at which defendant was seen by the witnesses. These factors indicate that the in-court identifications of defendant here arose solely from the improper lineup and that no independent source existed for the identifications. Yet both witnesses testified that they based their in-court identification of Jones on his noticeable eye defect. Both witnesses had the opportunity to see what was described as bulging of defendant's eye at the time the robbery occurred. Both testified that they again observed this eye defect at the lineup and based their identification there upon this factor. We do not think this is a reasonable basis for concluding there was an independent source for the identifications of Jones. On the contrary, it would seem that since no mention of the eye defect was contained in the description given to the police by the witnesses immediately after the robbery, the lineup which was fatally suggestive was the sole basis for the in-court identification of the defendant. There was no independent origin as contemplated in *Wade* and *Gilbert,* and therefore the in-court identification in this case should not have been allowed.[16] This does not preclude the state on the new trial in this matter from attempting to establish an identification of the defendant sufficiently independent of the tainted lineups to be free of constitutional invalidity.[17]

[16] *See Gilbert v. California, supra,* footnote 12, at pages 272, 273.
[17] *See People v. Caruso* (1968), 65 Cal. Rptr. 336, 436 Pac. 2d 336.

*Jones' confession.*

After the second lineup held in this case, the defendant made inculpatory statements to Detective Jackson. In the previous *Wright Case,* the presiding judge refused to permit the statement of Jones, in which he admitted his participation in the American Motors case, to be admitted into evidence during the trial in that case. That statement was made at the same time the inculpatory statement in question here was made. However, Judge RICE, after a *Goodchild* hearing,[18] permitted testimony of this statement to be given. After this hearing Judge RICE made the following ruling:

"Now, Det. Jackson did not advise the defendant completely of all of his rights to remain silent forgetting or not telling him that he could stop answering questions at any time and that he had a right to have an attorney present during the interrogation. I find, however, that Mr. Jones talked to an Attorney Sekora and Attorney Conen, both of whom are associated with the same firm and that Mr. Conen when he testified assumed that he was representing Mr. Jones at the time and did discuss with him his rights to remain silent and did tell him, although he does not remember specifically, did tell him that he had no obligation to say anything, to make a statement to anyone. He does not remember whether Det. Jackson asked him if he could speak to his client or to the defendant, however, Det. Jackson says that he asked Mr. Conen if he could speak to his client and immediately thereafter he did discuss with Mr. Jones and particular admissions resulted from this discussion and immediately before this admission was made by the defendant Det. Jackson told him that he continued to have the right to remain silent and anything he said would be used for or against him.

---

[18] *See State ex rel. Goodchild v. Burke* (1965), 27 Wis. 2d 244, 133 N. W. 2d 753; *Roney v. State* (1969), 44 Wis. 2d 522, 171 N. W. 2d 400.

"I rule then that the opportunity that Mr. Jones had to discuss this situation with the two attorneys and the fact that the attorney did say to Mr. Jackson that he could question him do result in an effective waiver of the right to be represented by an attorney at the time these admissions were obtained as this effective waiver is described by the Miranda Decision and the Supreme Court of Wisconsin.

"I should say for the record that I find that Mr. Jackson did not ask Conen to be present during Jones's interrogation and that Det. Jackson did not inquire of Conen specifically if he represented Mr. Jones."

Defendant makes several attacks on this ruling, claiming among other things that he was never given an adequate *Miranda* [19] warning concerning his right to remain silent and that the warning given was too long before the interrogation to protect his constitutional rights.

Attorney Conen's testimony rebuts these arguments. As previously indicated, this court in *Wright* found that Attorney Conen represented the defendant during the lineups. In this case, Attorney Conen testified that prior to Jones' statement to the police he advised Jones that he was "not under any duty or obligation to make any statement or make any disclosures to anyone and could rely on his constitutional privileges." This testimony clearly indicates that while the police may have failed in their duty to give the proper warnings to the defendant, this failure was cured by the defendant's attorney advising him of his rights. This intervening action by Attorney Conen shortly before the statements were made answers the defendant's claim that the warnings by the police were given too long before the statement to be effective. Defendant was not prejudiced. Defendant objects to the finding that Attorney Conen represented him at any time, but this finding is not against the great weight and clear preponderance of this evidence,[20] has

---

[19] *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694.

[20] *See Schwamb v. State* (1970), 46 Wis. 2d 1, 173 N. W. 2d 666.

previously been affirmed in the *Wright Case,* and is re-affirmed here.

Defendant also contends that even assuming Attorney Conen was representing him at the time he made the inculpatory statements, the trial court erroneously ruled that Attorney Conen's statement to Detective Jackson that he could question the defendant was an effective waiver of the right to be represented by an attorney. According to the defendant, this alleged waiver was not part of any trial strategy and he did not authorize or participate in it.[21] The facts and circumstances surrounding this alleged waiver, while unclear, indicate otherwise. Shortly after Attorney Conen left the police station, the defendant made his statement admitting his participation in the St. Elizabeth's robbery. No allegation is made that this statement was involuntary and the result of overreaching of the police. The defendant's position throughout the trial was that he never made any statement to Detective Jackson. The finding by Judge RICE that defendant at the time he made the inculpatory statement had waived his right to have counsel present is not against the great weight and clear preponderance of the evidence.[22]

## *Res judicata.*

Defendant's counsel argues that Judge MUELLER'S prior ruling that Jones' statement admitting his involvement in the American Motors robbery was inadmissible should be res judicata in this case and thus prevent the consideration of the statement inculpating him in the St. Elizabeth's robbery. We disagree.

Although these two statements were made at the same time, the claim that a ruling in a prior case excluding

[21] *See Henry v. Mississippi* (1965), 379 U. S. 443, 85 Sup. Ct. 564, 13 L. Ed. 2d 408; *Brookhart v. Janis* (1966), 384 U. S. 1, 86 Sup. Ct. 1245, 16 L. Ed. 2d 314.

[22] *Supra,* footnote 20.

one statement because the *Miranda* warnings had been given too long before the confession should be res judicata in this case is untenable.

The state argues correctly that the doctrine of res judicata applies only where the previous determination reaches the ultimate issue of guilt or innocence.[23]

In *People v. Dykes*[24] the issue raised was whether physical evidence suppressed during an earlier prosecution of the defendant because a court had found the search and seizure to be illegal, could be received in evidence at a subsequent trial of the same defendant for another offense before a different judge of concurrent jurisdiction. That court stated:

"A determination either of fact or law cannot be said to be an adjudication unless it settles a matter directly in issue. A question of fact becomes an issue when it is one which must be determined before the ultimate decision can be reached. Whether the search of Dykes' car was legal was not an essential question of fact. It related only to admissibility of the evidence. Proof of possession of the guns in the car could have been made in many ways, but each fact sought to be proved in the process would not be a fact in issue or, in other words, a fact the existence of which was essential to the judgment. The municipal court judgment or the ruling suppressing the evidence determined an incidental question of law; but it determined no issue of law or fact which had to be decided before the court could determine the issue of guilt, namely, whether Dykes had the guns in his car.

". . .

"Only confusion and injustice would result from applying the doctrine of collateral estoppel to every ruling made preliminary to the receipt or rejection of offered evidence. Many instances of misapplication of the doctrine come to mind. One would be the exclusion of evidence which had been seized for the refusal of the People to name an informer, as the People have a right to do, at the expense of suffering a dismissal, and a later ruling of another court in another case holding itself bound by the former ruling. By such a ruling the People would be penalized,

---

[23] *See generally:* Annot. (1966), 9 A. L. R. 3d 203.
[24] (1966), 243 Cal. App. 2d 572, 578, 579, 52 Cal. Rptr. 537.

under the doctrine of collateral estoppel, from exercising an undoubted right of choice. We have already seen the injustice that can result from such an unrestrained extension of the doctrine. The evidence that was offered by the People would have conclusively established the guilt of both defendants. Dorrough has gone free on the strength of a ruling of the municipal court in Dykes' first trial which was held to be binding upon the court in the robbery trial. Dykes will also be turned loose to join Dorrough in preying upon the citizens unless the People, upon a retrial, are permitted to prove that he robbed his victims, which he unquestionably did, using the very guns that were taken from him.

"In a retrial, if there is one, admissibility of the People's evidence should be ruled upon as if offered for the first time." [25]

Here, too, in the instant case the doctrine of res judicata is inapplicable.

While Judge MUELLER'S ruling settled the admissibility of defendant's confession in the *Wright Case,* it had no effect on a subsequent prosecution of the defendant for another crime. Moreover, at the time Judge MUELLER made his ruling, he did not have the benefit of Attorney Conen's testimony that he had advised the defendant of his rights prior to the defendant's confession. Attorney Conen was unable to testify in the American Motors trial because he was recuperating from a heart attack at that time. Thus, Judge MUELLER was not informed of the substance of Attorney Conen's conversation with the defendant. Here, Judge RICE knew that Attorney Conen told defendant of his rights. He was free to enter his ruling regardless of Judge MUELLER'S prior ruling.

*Claimed fruit of the poisonous tree.*

Defendant claims that since his identification in the Ohio lineup was constitutionally defective, any subsequent identification is likewise improper since it is tainted by the illegality of this first lineup and any subse-

---

[25] *Id.* at page 542.

quent identification is the "fruit of the poisonous tree."[26] Defendant also claims that the confession of defendant should have been barred as evidence for the same reason. While the Ohio lineup may have been completely illegal, there is nothing in this record to indicate that this lineup in any way influenced the subsequent identification of the defendant or his confession. The argument is made that had it not been for the Ohio lineup, the defendant would not have been returned to Milwaukee for the subsequent proceedings.

The United States Supreme Court in discussing this issue, has said:

". . . [T]his is not the case envisioned by this court where the exclusionary rule has no application because the government learned of the evidence 'from an independent source,' *Silverthorne Lumber Co. v. United States,* 251 U. S. 385, 392; nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.' *Nardone v. United States,* 308 U. S. 338, 341. We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). . . ."[27]

In the instant case, even assuming the Ohio lineup was defective, any subsequent activity by the Milwaukee police was sufficiently distinguishable to dissipate the original illegality.

Moreover, robbery was not the only charge against defendant since prior to his return from Ohio a criminal

[26] *See Silverthorne Lumber Co. v. United States* (1920), 251 U. S. 385, 40 Sup. Ct. 182, 64 L. Ed. 319.

[27] *Wong Sun v. United States, supra,* footnote 14, at pages 487, 488.

warrant had been issued in Milwaukee charging the defendant with operating an automobile without the owner's consent. No lineup was held on this charge.

Other issues are raised by the defendant but we do not think any of them require discussion since the case must be reversed and the cause remanded for a new trial.

*By the Court.*—Judgment reversed and cause remanded for new trial.

ROBERT W. HANSEN, J. (*dissenting*). New land mines are placed in the path of police-conducted lineup identifications of suspects in criminal cases. To be exact, three land mines, to wit:

(1) *Accusatorial* (*?*) *Stage.*

Upholding the lineup identification and conviction of this defendant in another credit union holdup, this court held that the defendant was represented by counsel at the lineups involved in that case, the same lineups as here involved. *Wright v. State* (1970), 46 Wis. 2d 75, 175 N. W. 2d 646. In another case decided the same day, this court, as to prewarrant lineups, made a distinction between investigatory and accusatorial identifications. *Hayes v. State* (1970), 46 Wis. 2d 93, 175 N. W. 2d 625. Here the majority tersely states, "The instant matter had also reached such (accusatorial) a stage." This finding was made unnecessary by the earlier holding that counsel was present.

What makes the lineup here accusatorial? The defendant was returned from Ohio under a warrant charging him with participation in a different credit union robbery. What makes viewing of an in-custody suspect, arrested on one charge, by victims or witnesses of other crimes "accusatorial"? What is left of any distinction between "investigatory" and "accusatorial"? Or is the majority now saying that any viewing of a defendant in custody on one charge is automatically "accusatorial" as to investigations of any other crimes? This is not repeating

the *Hayes* test. It appears to be a reversal of *Hayes* to provide that there is now established a right to counsel at any in-custody lineup, regardless of whether it is investigatory or accusatorial. If this is what is intended, it should be clearly spelled out instead of being left as an explosive charge for future detonation.

(2) *Sartorial Similarity.*

The majority finds a fatal flaw in the identification of the defendant as one of the gang that held up the St. Elizabeth's credit union in that the defendant and another suspect wore camel-colored coats during one of the three lineups conducted. There is no suggestion that counsel for the defendant objected in any way to the donning of the camel-hair coats. Nor is there any connection between camel-colored coats and the credit union armed holdup here involved. The robbery took place in September, hardly the season for overcoats. The testimony reveals that the defendant, wearing a jacket and carrying a gun, leaped over a counter to get at the money. That would be quite a gymnastic feat for an overcoat wearer. The attorney for the defendant on this appeal, at the time of oral argument, forthrightly stated that the camel-colored coat had no relationship to the crime here involved. The majority holds, however, that a camel-colored coat makes a person stand out.

There were four persons in the lineup, two suspects and two police officers. The viewers were to determine if they recognized any of the four as one of the holdup gang. Thus the viewers were concerned with facial features, identifying characteristics, body build, general appearance. How could putting an overcoat on a person whom the witness had seen wearing a jacket make identification of such person as one who committed the crime involved more likely? Criminals on the lam don different clothing than they wore at the scene of their crimes to escape detection, not to facilitate it. If clothing, not in any way similar to that worn at the time of the crime, is

that important, might not form and fit be equally relevant? If one person in the lineup wears garments that are several sizes too small or too large, might not this also "attract special attention"? Perhaps police departments are to bring in tailors to insure that lineup participants are similarly attired and properly fitted. Or, is the majority saying that all persons in a lineup must don the same color and type of garment? If so, it would be best to say so, rather than to leave for the future what sartorial dissimilarities render a lineup identification subject to future attack.

### (3) *What Bandwagon?*

The majority finds a bandwagon aspect to the lineups here involved, citing a United States Supreme Court decision in which over one hundred witnesses to various crimes were in a room and, one after the other, shouted out their identifications of the suspect as perpetrator of a number of crimes. *Gilbert v. California* (1967), 388 U. S. 263, 87 Sup. Ct. 1951, 18 L. Ed. 2d 1178. No student of group psychology would deny the bandwagon aspect of shouted identifications piling one upon the other in such a mob scene. However, here the defendant was identified during three lineups as participating in two crimes: The American Motors Company and St. Elizabeth's robberies. The record shows that there were four witnesses from the St. Elizabeth robbery at the lineup when the oral identification was made. Two of these witnesses were never able to identify the defendant as a participant in this crime. So here there was no mob scene, no band, and no wagon. In fact, since the defendant was not identified at the first lineup, any bandwagon tendency, if one there was, moved away from, not toward, the wholesale identifications the United States Supreme Court found objectionable. Additionally, the defendant, this court has found, was represented by counsel at these lineups and no objection of any type was made to having witnesses to more than one crime present. Or is the

majority saying that a police-conducted identification lineup must be limited to one particular incident, with no witnesses or victims of other incidents permitted to be present? If that is what is meant, it goes well beyond the *Gilbert Case,* but it had better be stated now and not exploded later.

Prompt and proper identification of suspects is an important tool of law enforcement, not alone for the identification of one who committed a crime, but for the release from custody and suspicion of those who are cleared by the lineup. Despite its role in determining innocence as well as guilt, the majority opinion here makes hazardous the use of police-conducted, in-custody lineups. The prudent prosecutor and law officer in this state may well conclude that the use of in-custody lineups, even with the defendant, as he was here, represented by his counsel, involves jeopardizing an entire case against a particular defendant. If so, the direct confrontation between witness and suspect, or identification based upon examination of photographs, may well appeal as, perhaps less reliable, but certainly less vulnerable to later courtroom attack. If so, an important tool in seeking the truth in criminal investigations will have been taken from law enforcement officers. As always, it will be the innocent who will suffer, those inaccurately suspected of criminal involvement as well as the victims of crime and the general public. It is not too much to say that this decision places new hazards in the path of effective law enforcement, all the more fearful because their exact location and range of blast is not made clear.

The writer would affirm the conviction here, finding that the police-conducted lineup was investigatory, that it was not suggestive, and that defendant was represented by counsel who made no objection to the procedure followed. Alternatively, because the majority correctly finds the defendant's confession to be admissible, I would hold error, if such existed, to be ". . . harmless beyond a

reasonable doubt." *Chapman v. California* (1967), 386 U. S. 18, 24, 87 Sup. Ct. 824, 17 L. Ed. 2d 705. If the concept of a criminal trial as a search for truth is to be given more than lip service, the confession itself warrants affirmance of the conviction and judgment.

I am authorized to state that Mr. Justice HANLEY joins in this dissent.