No. 24244.

DOUGLAS DUANE EDMISTEN v. THE PEOPLE OF THE STATE OF COLORADO.

(490 P.2d 58)

Decided November 1, 1971. Rehearing denied November 15, 1971.

264

Daniel B. Mohler, for plaintiff in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, E. Ronald Beeks, Assistant, for defendant in error.

*En Banc.*

MITCHEL B. JOHNS, District Judge*, delivered the opinion of the Court.

THE plaintiff in error, Douglas Duane Edmisten, will hereinafter be referred to as the defendant.

On November 22, 1968, defendant was charged by information with aggravated robbery of one Steven Burns Colby on November 9, 1968. On December 12, 1968, the information was amended by adding counts alleging that the defendant had been convicted twice previously of a felony. These additional counts were filed under the Colorado Habitual Criminal Statute, C.R.S. 1963, 39-13-1.

The evidence adduced at the trial showed that the victim named in the information, Steven Burns Colby, an 18-year-old youth, was working alone at the service station at the time of the robbery on November 9, 1968. At approximately 7:30 p.m., a man on foot approached him and asked to buy a can of gas for his car, which had run out of gas down the road. Colby testified that the man was about six feet tall, wearing a gray three-quarter length coat, gray pants, a white baseball-type cap with earmuffs over his ears, with reddish sideburns and a very prominent mustache, reddish in color, and possibly a red plaid shirt. Colby testified that when he first saw the man in question, the first thing he noticed was the man's face, mustache and nose.

Colby further testified that he filled up the gas can and the two entered the office of the station, where Colby requested a three-dollar deposit for the gas and the can. As Colby proceeded to open the cash register, the man pulled out a pistol and told Colby to put the money in a box he was holding. The pistol then discharged. A slug and empty cartridge were found by the police in the immediate vicinity of the cash register. The police identified the gun used in the robbery as a .22

caliber pistol. The robber took approximately $133 from the cash register, forced Colby to walk away from the station and then fled.

The evidence further disclosed that the police officer summoned to the scene established the robbery at 7:50 p.m., that he arrived at the filling station at approximately 8:00 p.m., and that Colby was very nervous and very shaken, but that he was coherent; also, that Colby was near-sighted and was not wearing glasses on the night in question.

The People's evidence showed that a person, subsequently identified as the defendant, attempted to rob, at gunpoint, Ben's Sporting Goods, owned by Kenneth Benjamin. The testimony of Benjamin and another eyewitness, Albert Montgomery, showed that at approximately 6:00 p.m. on November 9, 1968, a man drove a tan Oldsmobile through the parking lot in front of the sporting goods store and then out of the lot. Shortly thereafter the man returned on foot to the store, where he encountered Benjamin closing the store. The man confronted Benjamin with a pistol and demanded that Benjamin reopen the store. Benjamin refused and terminated the confrontation by walking into a nearby drug store. Witness Montgomery described the man as wearing a mustache, a three-quarter length topcoat, and a cap with a bill.

On November 12, 1968, a line-up was conducted relating to possible identification of suspects in the service station and the sporting goods store. The defendant was not placed in the line-up; however, present and designated as man number three was a Lloyd Anthony Brinkman, who was identified as a suspect by Colby. Benjamin, who also viewed the line-up, told a police officer of the Colorado Springs Police Department that he picked number three in the line-up, ". . . because of his features. They were similar, mustache, height, weight, were all identical to the party that had stuck him up." He did not, however, identify anyone in that line-up.

Prior to the line-up of November 12, 1968, Colby was shown a color picture of Brinkman, at which time he stated, "That is the man. I am almost sure that is the one. I would like to see him." On November 21, 1968, a second line-up was held and the defendant was placed in such line-up. Benjamin and Colby each identified the defendant. Montgomery also identified the defendant in the line-up, and stated that the defendant was identical or similar to the person he saw in the shopping center.

In the November 21, 1968, line-up, five persons were placed for viewing; three of them wore false mustaches, leaving only the defendant and another with a natural mustache. Also, the participants, other than the defendant, appeared cleaner, neater and trimmer. During the line-up proceedings an attorney was present and represented the defendant. A photograph of the line-up was later introduced in evidence.

In that line-up the attorney, upon order of court, repaired to the place where the line-up was being conducted to represent the defendant. At that time he requested and was allowed to confer with two of the persons who were placed for viewing, and also was allowed to speak to and discuss the line-up with the defendant. He also requested that the defendant be allowed to shave, because the other participants were clean-shaven. The defendant was furnished an electric razor and he shaved, but retained his mustache. In addition, his appointed counsel requested that the defendant be allowed to comb his hair, and that since the defendant had on a plaid jacket, that the other members be required to wear jackets. When these requests were made, counsel made no objection at the time the line-up was conducted, nor did he make any comments as to the manner in which the line-up was conducted. The witnesses to the line-up were not allowed to confer with each other and were given pen and pencil to write their respective opinions concerning whether each witness could recognize tentatively or positively, according to the number assigned to

each individual in the line-up, and this was done individually.

An *in camera* hearing was held on defendant's motion to suppress the in-court identification as being tainted. The facts concerning the line-ups, as aforestated, were fully developed. The trial court denied such motion and specifically found: "There was nothing unduly suggestive in this case. In fact, from the witnesses called by the defendant himself, it was the features and face that was the strong identifying point in this case. In fact, the Court has never heard a stronger case for the upholding of the constitutionality of the line-up."

At the trial, before the jury, the matters relating to the two line-ups were again detailed for the jury, including the photograph of the November 21, 1968 line-up, which showed the appearance of the participants and particuuarly the mustaches worn by each.

The defendant was convicted of both the aggravated robbery charge as well as the habitual criminal count. The appeal followed. The defendant assigned several grounds for reversal; however, since only two need be considered for disposition of this review, the other assigned errors need not be discussed.

I.

THE LINE-UP — Was the identification of the defendant tainted by the events which led up to the in-court identification? Counsel for defendant contends in his brief:

". . . [A]ny in-court identification of the defendant, whether it was based on the lineup or not, should have been suppressed because it was tainted by the unconstitutional lineup resulting in identification without sufficient independent origin. Said identifications were achieved by exploitation of the illegal lineup rather than by means sufficiently distinguishable to be purged of the primary taint. Courtroom identification is not admissible at all unless the state can establish by clear or convincing proof that the testimony was not the fruit of the earlier

identification. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)."

Without commenting on the correctness of the defendant's postulation, this court is of the opinion that the cited cases and the facts of the instant case do not support the defendant's position. *Stovall* concerned itself with the retrospectivity of *Wade* and whether the totality of the circumstances concerning the conduct of the line-up were so unnecessarily suggestive and conducive as to lead to irreparable mistaken identification.

The touchstone of *Wade* and *Gilbert* is the absence of counsel at one critical stage of the prosecution, namely, the line-up. The court proscribed the use of suggestive pretrial line-ups and premised its opinion that in addition to an accused's guaranteed right to the presence of counsel at trial, such right is available to him at any stage of the prosecution, formal or informal, where the absence of counsel might derogate from his right to a fair trial. *Wade, supra.* The court's rationale was twofold: (1) the presence of a defense-oriented professional might serve to prevent the use of prejudicial identification measures, and (2) the absence of counsel at a line-up might deprive an accused of the ability effectively to reconstruct at trial any unfairness that occurred at the line-up and thus deprive him of his only opportunity meaningfully to attack the credibility of the witnesses' courtroom identification. The court recognized that there "... is grave potential for prejudice, intentional or not, in the pretrial line-up ..." and the necessity of counsel for a meaningful confrontation at trial. *Wade, supra,* 388 U.S. 236-237.

▪ Impressing *Wade* and *Gilbert* on the totality of the facts and circumstances concerning the two line-ups as they affected the courtroom identification of the defendant, the evidence does not warrant this court to find,

as a matter of law, that the motion to suppress, bottomed on Wade and Gilbert, should have been granted. As has been previously stated, the thrust of those cases is absence of counsel at a line-up. In this case an attorney was not only present at the November 21, 1968 line-up, but, as the record reflects, actually participated in the events that led up to the presentation of the participants in the line-up. He was permitted to confer with two of the persons who were placed for viewing; he conferred with the defendant; his efforts resulted in the defendant having been viewed as clean-shaven, with his hair combed, to conform with that aspect of the appearance of the other members of the line-up; he was successful in having all such members placed in jackets to conform with the fact that the defendant was wearing a jacket, albeit the defendant's was plaid. Moreover, the appointed attorney never objected as to the manner in which the line-up was conducted nor, as the record reflects, did he object to the line-up itself. The *only case* which has surfaced where the line-up has been held tainted under *Wade* and *Gilbert* is *Jones v. State*, 47 Wis.2d 642, 178 N.W.2d 42, where the court struck down a line-up as being unfair and suggestive because of the manner in which the line-up was conducted, despite the fact that the defendant was represented by counsel at the time of the line-up.

The court is cognizant of the pronounced authority that the efficacy of the right to counsel is the effective representation of legal professionalism, and not the mere presence of an attorney. The record in this case in no manner warrants a finding that counsel's participation in the line-up was not effective.

Consideration must next be directed to whether the circumstances of the line-ups were so "unnecessarily suggestive and conducive to irreparable mistaken identity" as to constitute a denial of due process of law under *Stovall*. The record, considered in its entirety, leads us to the conclusion that we cannot say, as a matter of law,

that the "totality of the circumstances" would render the line-up as tainted and constitute a deprivation of due process of law.

 Unless the record establishes taint of mistaken identity, the test of *Stovall* is best left for resolution in the trial court. This factual issue was fully presented in the lower court both before the jury and out of the presence of the jury. The trial judge, *in camera*, found no unnecessary suggestibility; in fact, he found to the contrary. Of significance is the completeness with which the circumstances of the line-up were presented to the jury. That fact-finding body heard the testimony concerning the manner in which the November 12, 1968 line-up was conducted, the tentative identification of Brinkman by Colby and Benjamin, the viewing of the color photograph of Brinkman by Colby prior to that line-up, and the statements he made about such photograph. The jury also obviously evaluated the totality of the circumstances of the November 21, 1968 line-up. It had the benefit of the photographs of the November 12 and the November 21, 1968 line-ups as well as the recounting of the on-the-scene events by the eyewitness. These issues were properly for the jury for resolution within the scope of their function in the judicial process. The disposition of this aspect of this case is clearly guided by this court's pronouncement in *Neighbors v. People*, 171 Colo. 349, 467 P.2d 804, wherein it was stated at 807: "In our opinion, suggestiveness, at least under some circumstances, may properly be left as a consideration for the jury in determining what weight to attach to the in-court identification of the defendant. We are concerned here not with a question of suggestiveness by itself, but with a question of what constitutes a denial of due process of law. The basic concern of this court is whether the procedure followed in conducting a lineup identification may have, under all the circumstances of the case, resulted in a misidentification of the defendant at the trial. As the court noted in *Stovall v. Denno, supra,*

a conviction which rests on a mistaken identification is gross miscarriage of justice."

The court concluded:

"The jury heard testimony on how the line-up was conducted. It was fully within their province to consider the suggestiveness of the procedure when weighing the in-court identification of the defendant by the witnesses."

The contention of the defendant that the false mustaches worn by some of the participants and his untidy appearance were salient in pointing the accusatory finger at him and so suggestive that he was denied due process is met with clarity in *Schott v. People,* 174 Colo. 15, 482 P.2d 101:

"It is next contended that the court erred in admitting into evidence the photograph and testimony of the lineup and that the procedures used in conducting the lineup were so unfair as to taint the in-court identification, thus denying defendant due process of law. Defendant objected to this evidence on the ground that the lineup was so suggestive as to the clothing worn by defendant that it was conducive to misidentification and therefore unlawfully tainted the in-court identification. The trial court overruled the objection, holding that the matter of suggestibility concerned not the admissibility but only the weight of the evidence. This ruling was correct, unless we are compelled to say as a matter of law that the degree of suggestibility under the totality of circumstances was so extreme as to taint the in-court identification."

*See also Thurman v. State,* 262 N.E.2d 635 (Ind.).

Counsel for defendant leans heavily on *People v. Caruso,* 68 Cal.2d 183, 65 Cal.Rptr.336, 436 P.2d 336, where a line-up was declared unnecessarily suggestive and conducive to irreparable mistaken identification because the defendant, who was six feet one inch tall, weighing 238 pounds, of Italian descent, and very dark complexioned was placed in a line-up with other persons who did not resemble him in complexion, size or hair. There the court

held as a matter of law that the grossly unfair makeup of the line-up deprived the defendant of due process of law. Moreover, the defendant was not represented by counsel at the line-up.

 The evidence was sufficient to warrant a finding by the jury on the in-court identification to satisfy the independent origin test set forth in *Wade*. The witness Colby had a one-on-one confrontation with the defendant at the time of the robbery and described his appearance. The weight of such testimony was for the jury.

The foregoing treatment of the line-up is necessitated by the fact that in the event of a retrial, an assignment of error based on the deficiencies of the line-up will have been obviated.

## II.

THE REFERENCE TO OTHER CRIMES — In the course of the trial, the following transpired. On cross-examination the defendant was queried as follows:

"Q Well, one of you is. Now, you heard Sherry Wieland testify. Now, Mrs. Wieland is a friend of yours, isn't she?

"A Not a friend. We just know each other.

"Q You and her husband were good friends?

"A Yes.

"Q Isn't it true that you used to stash loot in the basement of their house?

"MR. MOHLER: I would object to the terminology used and the apparent purpose for that question. I think it should be stricken and the jury instructed to disregard it.

"MR. MULTZ: I want to know the reason.

"MR. MOHLER: He said 'stash loot.' I don't know what he means by that, but I know what he is trying to imply. I ask it be stricken.

"MR. MULTZ: Your Honor, I want to establish a proper perspective between —

"THE COURT: Objection overruled. Go ahead and answer the question.

"Q Can you answer? Is it true or not?

"A What do you mean by 'loot'?

"Q Things that you and Mr. Wieland had picked up as a result of burglaries around the city.

"MR. MOHLER: Objection, your Honor, and that is cause for a mistrial in this particular case.

"THE COURT: No, but I am going to sustain your objection. No mistrial, however, I will instruct the jury to set that out of your minds entirely, that we are concerned with this particular case or any matters that deal with it, related, and deal with it directly.

"MR. MOHLER: And Mr. Multz used the word 'burglary,' which is another offense in a prior conviction, and I ask he be admonished from further commenting on any such statement. Highly improper and prejudicial to my client and he knows it.

"MR. MULTZ: The defendant asked me to explain it. I didn't ask him the question. He asked me to explain and I explained.

"THE COURT: Well, we are on the wrong track. You people on the jury just disregard this whole business here and all the questions concerning it."

■■ The defendant alleges as error the elicitation from the defendant concerning other crimes with which he may have been involved. We agree. The general rule was stated in *Warford v. People*, 43 Colo. 107, 112, 96 P. 556:

"The general rule is, that evidence is not admissible which shows, or tends to show, that the accused has committed a crime wholly independent of the offense for which he is on trial. The reason for the rule is, that no person shall be convicted of an offense by proving that he is guilty of another. Evidence of such character creates a prejudice in the minds of the jury against the accused, and the rule should, therefore, be strictly enforced in all cases where applicable. To this general rule, however, there are exceptions. It is always proper to show the motive which may have prompted the accused to commit the crime for which he is being tried, and the intent with which he committed the acts which it is claimed constitute that

crime; and evidence which tends to prove either of these facts is relevant to establish the commission of the crime for which he is on trial, even though such evidence, for the purpose indicated, may tend to show the commission of similar and independent crimes by him. — Underhill on Criminal Evidence, Sec. 89-90; *United States v. Snyder*, 14 Fed. 554; *Gassenheimer v. The State*, 52 Ala. 313."

*See also Naranjo v. People*, 161 Colo. 76, 78, 419 P.2d 953; *Bell v. People*, 158 Colo. 146, 153, 406 P.2d 681; *Clews v. People*, 151 Colo. 219, 221, 377 P.2d 125; *Kostal v. People*, 144 Colo. 505, 511, 357 P.2d 70; *Webb v. People*, 97 Colo. 262, 49 P.2d 381.

 The defendant on trial for a specific offense should not be expected or required to meet anything other than the specific accusation made against him. An accused has the right to know precisely what he has to defend against. *Stull v. People*, 140 Colo. 278, 283, 344 P.2d 455.

 The question by the district attorney, "Isn't it true that you used to stash loot . . ." and "Things that you and Mr. Wieland had picked up as a result of burglaries around the city," do not come under any of the exceptions stated in *Warford v. People, supra*, and could only have convinced the jury that the defendant had been involved in other criminal offenses besides the one for which he was being tried. Defendant's right to a fair trial was vitiated in a substantive manner. As stated by Judge Parker in *Lovely v. United States*, 169 F.2d 386, 389:

"The rule which thus forbids the introduction of evidence of other offenses having no reasonable tendency to prove the crime charged, except insofar as they may establish a criminal tendency on the part of the accused, is not a mere technical rule of law. It arises out of the fundamental demand for justice and fairness which lies at the basis of our jurisprudence."

 The fact that the prejudicial evidence concerning other unrelated crimes was elicited from the de-

fendant on cross-examination does not make it admissible. *Weiner v. United States*, 20 F.2d 522, 523; *Hawkins v. State*, 80 So.2d 1, 11 (Miss.).

The attorney general argues that even if the district attorney's reference to other alleged violations of the law was objectionable, any prejudice that might have emanated therefrom was eradicated by the instruction of the trial court to the jury to disregard such testimony. The law is well defined in the case of *People v. Matteson*, 61 Cal.2d 466, 39 Cal.Rptr. 1, 393 P.2d 163, as follows:

"This defect in the trial was not cured by the court's striking the evidence and admonishing the jury to disregard it. Ordinarily the admission of incompetent evidence cannot be cured by striking it and instructing the jury to disregard it when it goes to a main issue of the case and when other evidence of guilt is not clear and convincing. (*People v. Hardy*, 33 Cal.2d 52, 61-62, 198 P.2d 865; *People v. Roof*, 216 Cal.App.2d 222, 226-227, 30 Cal.Rptr. 619). In cases involving involuntary statements of the accused, however, the weight of other evidence of guilt is not considered. Incriminating statements from defendant's own tongue are most persuasive evidence of his guilt, and the part they play in securing a conviction cannot be determined. (*See People v. Parham, supra*, 60 A.C. 333, 340, 33 Cal.Rptr. 497, 384 P.2d 1001). For the same reason, an admonition or an instruction to the jury to disregard involuntary incriminating statements does not cure the erroneous admission of such statements." (Citing cases from many jurisdictions.)

It is well established that error in admitting evidence may be cured by instructing the jury to disregard it unless such evidence is so prejudicial that the jury will unlikely be able to erase it from their minds. If it is so prejudicial, a mistrial should be ordered. *United States v. DeDomonicis*, 332 F.2d 207, 210; *Throckmorton v. Holt*, 180 U.S. 552, 21 S.Ct. 474, 45 L.Ed. 663.

We are of the opinion that the remarks of the trial judge in instructing the jury to ". . . just disregard this whole

business here and all the questions concerning it," was not sufficient to remove the taint of offensiveness concerning the defendant's connection with other burglaries.

No reference need be made to the assignment of error concerning the habitual criminal proceedings, since the defendant's conviction on that count is dependent upon the conviction on the robbery charge.

The judgment is reversed and cause remanded to the trial court for a new trial.

BYRON V. BRADFORD, District Judge*, participating.

MR. JUSTICE HODGES and MR. JUSTICE ERICKSON not participating.

*District Judge sitting under assignment by the Chief Justice under provisions of article VI, section 5(3) of the constitution of Colorado.