PENISTER, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–157–CR. Submitted on briefs September 14, 1976.—
Decided October 19, 1976.*
(Also reported in 246 N. W. 2d 115.)

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Marguerite M. Moeller,* assistant attorney general.

HEFFERNAN, J. After a trial by jury, Charles E. Penister was found guilty of carrying a concealed weapon in violation of sec. 941.23, Stats., and found guilty of being a party to the crime of armed robbery contrary to sec. 943.32 (1) (b) and (2) and sec. 939.05. He was sentenced to a term of fifteen years for armed robbery, and to a concurrent term of one year for carrying a concealed weapon.

The principal legal question posed by the appeal is whether, at the time Penister was apprehended, there was sufficient legal justification for the search made. It was this search which revealed a concealed sawed-off

shotgun and was the basis for the conviction on that charge. We conclude that, under the rationale of *Terry v. Ohio* (1968), 392 U.S. 1, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889, the officers had "reasonable suspicion" which justified the search.

It is also argued by Penister that, prior to trial, an accomplice in the armed robbery was promised immunity from prosecution for perjury if he would testify against Penister. Although we agree with defense counsel that such grant of immunity, if given, would be gross prosecutorial misconduct, and would necessitate ordering a new trial, there is no evidence that such a promise was ever made.

We conclude that the evidence was sufficient to convince the jury beyond a reasonable doubt that Penister had committed the crime of armed robbery. Accordingly, we affirm.

The facts revealed by the record show that at approximately 4:00 p.m. on January 9, 1974, two black men at gunpoint robbed Speth, an oil delivery man, and took from him a number of checks and several hundred dollars in cash. One of the robbers, later identified as Penister, threatened the delivery man with a sawed-off shotgun at the time of the robbery.

The description of the two robbers was reported to police headquarters shortly after 4:00 o'clock and was relayed to officers at the time of their 4:00 o'clock assembly and to officers who were on patrol. Officers Jacob and Wessel obtained the description of the robbers at approximately 4:10 p.m. At approximately 5:00 p.m. on that day, those officers responded to a complaint that a black man named Sam Stacy was carrying a sawed-off shotgun in a tavern on North 11th Street.

Upon entering the tavern, Officers Wessel and Jacob saw a man matching the description of Sam Stacy standing with another black man near a door to an adjoining room at a distance of approximately 12 feet from the

other tavern patrons, who were assembled at the bar. Officer Wessel, on the basis of the report that a black man wearing a brown coat was carrying a sawed-off shotgun, patted Stacy down and removed a sawed-off shotgun.

Both of the men were wearing coats that were buttoned to the top. The two men, Officer Wessel said, looked like they either had entered together or were about to leave together. Penister was then patted down by Officer Wessel; and he, too, was discovered with a concealed sawed-off shotgun. Both men were arrested for carrying concealed weapons.

A subsequent search of Stacy revealed a .22 caliber revolver and some checks that were established as being taken from Speth, the victim of the earlier armed robbery. On one of the checks in Stacy's possession, the name of the payee had been erased and the name Charles Penister was substituted.

Later that day Stacy gave the police statements which implicated Penister and a Duane Taylor in the armed robbery. On the following day, January 10, 1974, Stacy was charged with two counts of carrying a concealed weapon, Penister was charged with one count of carrying a concealed weapon, and Stacy, Penister, and Taylor were charged with being parties to the crime of the armed robbery of the oil delivery man.

On January 10, 1974, Penister and Stacy were identified in a lineup as being the persons who committed the armed robbery of the delivery man. On January 17 all three defendants were bound over to the circuit court for trial upon the armed robbery charge.

On April 8, 1974, a *Goodchild*-type hearing was held on the motion of Stacy and Penister to suppress any statements and admissions made by the defendants on the grounds that such statements were not voluntary and on the ground that the arrest of Penister was without probable cause.

The court ordered the suppression of the statements because of the conditions of the interrogations but validated the arrests on the ground that they were validated by *Terry v. Ohio, supra.* He held that, under the circumstances, the officers had reasonable suspicion to stop and frisk Penister and Stacy.

The trial of Stacy was severed from that of Penister; and Stacy, in accordance with the grant of immunity, was one of the principal witnesses against Penister.

Subsequently, Stacy was sentenced to six years for the armed robbery; and, as stated above, Penister was sentenced to fifteen years for the same crime.

From the time of the commencement of these proceedings and through this appeal, counsel for Penister has argued that the search of Penister in the tavern was without justification and that the police had neither probable cause to make the arrest nor a reasonable suspicion on which to base the pat-down.

It seems clear that the officers in the tavern did not have probable cause to arrest Penister. We conclude, however, that, under the circumstances, there was a "reasonable suspicion" that Penister had committed a crime or was in the process of committing one.

Defense counsel assumes that the state's rationale for the pat-down of Penister was because the earlier pat-down of Stacy revealed the presence of a shotgun. We conclude, on the basis of the record, that the reasonable suspicion which the officers had of Penister was not founded on so narrow a basis.

It is indeed true that the pat-down or frisking of Stacy was initiated by separate information. The police officers had been informed by radio dispatch that a black man known to be Stacy and reported to be wearing a brown coat was seen with a sawed-off shotgun in the tavern. It was on the basis of this information that the police officers were justified in frisking and arresting Stacy.

These officers were, however, informed, prior to the entry of the tavern, that an armed robbery had been committed by two black men in the vicinity.

At the hearing on the motion to suppress the fruits of the alleged illegal arrest, Penister's counsel asked these questions and elicited these answers of Officer Wessel:

"Q Officer Wessel, the only two things that you say gave you reason to pat him down was that he may be with Mr. Stacy and, too, he had a coat buttoned up; is that right?

"A No, that's not correct.

"Q All right. What else?

"A Well, the fact that Mr. Stacy had a sawed-off shotgun, and he was—fit the description of a robbery which had just occurred an hour or two previous, I suspected that both defendants may have been involved because the robbery description included more than one male.

"Q So you had a description of a robbery that had taken place, is that right, Officer, at that time and place?

"A That's correct.

"Q And what description did you have?

"A One of the defendants had a brown leather coat on. I don't recall the rest of the description without refreshing my memory.

"Q . . . .

"Q Fine. Officer, didn't you testify in direct examination that you first discovered that they matched the description of two perpetrators of an armed robbery earlier that day after you had arrived back at the 5th District Station?

"A No.

" . . . .

"Q Officer, can you indicate to the Court at this time what feature of Mr. Penister matched the description as you saw Mr. Penister for the first time at this place at approximately five o'clock, 2779 North 11th Street?

"A His age, his height, and his weight.

"Q Anything else?

"A The fact that he was with another black male who matched the description of one of the perpetrators of the armed robbery.

" . . . .

"Q  What crime did you suspect he had been involved in?

"A  I suspected an armed robbery."

Under these circumstances, where the police officers were aware of the fact that an armed robbery had been committed only a short time before by two black men and that a sawed-off shotgun was used, it was not unreasonable for them, under the circumstances, to reasonably suspect that the two black men at the tavern, one of whom clearly matched the description of the robbers and was known to be carrying a sawed-off shotgun, were the perpetrators of the armed robbery. The radio dispatch of the tavern incident had positively identified one of the individuals, Stacy, by name and had given his description. Both of the men were wearing overcoats buttoned up to the neck.

We conclude that these circumstances, taken together, gave rise to a reasonable suspicion which justified the officers frisking both individuals. We do not base our conclusion that the stop and frisk of Penister was justified merely because the prior search of Stacy revealed the presence of a sawed-off shotgun. It is the totality of the circumstances, the fact that the officers, prior to the tavern entry, had received the description of the armed robbers, and the circumstances of the encounter in the tavern that justified the search of Penister, as well as Stacy. We conclude that the search of Penister, which revealed the sawed-off shotgun, was legally justifiable and the subsequent arrest was valid.

The evidence to connect Penister with the armed robbery was not based alone upon Stacy's testimony as a witness for the prosecution, for Penister was identified by Speth, the oil delivery man, as being one of the robbers, both at the line-up and at trial.

The line-up identification is attacked because, at that procedure, the clothes worn by Penister and Stacy were those described by the delivery man as being worn by

the robbers. It is claimed, therefore, that the victim of the robbery was identifying the clothes and not the men who were accused. However, it is not argued that the line-up was so suggestive that the identification procedure constituted a denial of due process. Intentionally putting suspects in a line-up in clothes setting them apart from others or similar to those described by witnesses has indeed been found to be unduly suggestive and constitutionally defective. *Foster v. California* (1969), 394 U.S. 440, 89 Sup. Ct. 1127, 22 L. Ed. 2d 402; *Jones v. State* (1970), 47 Wis. 2d 642, 178 N.W. 2d 42.

Here, there was no evidence to show that the line-up was rigged or staged to suggest that Penister or Stacy were the robbers. They were put in the line-up in the clothes in which they were arrested.

Admittedly, eyewitness identification is not universally trustworthy. However, the question is one of credibility, and it was up to the jury to determine whether the witness had a sufficient basis to make the identification, and it was for the jury to determine whether the witness was telling the truth.

This court has recognized the problems inherent in eyewitness identification, but the issue is an evidentiary one. We faced a somewhat similar problem in *State v. Clarke* (1967), 36 Wis. 2d 263, 153 N.W. 2d 61, cert. den. 393 U.S. 861, 89 Sup. Ct. 140, 21 L. Ed. 2d 129. Therein we said:

"... it is difficult to see how under the present facts this court can state as a matter of law that the testimony affecting the credibility of the identifications must have raised a reasonable doubt in the minds of the jury as to the identification of the defendant ...." (P. 275)

We see no constitutional defect in the line-up, and the questions posed by the defense counsel in respect to identification are those that go to credibility and must be resolved by the jury.

It should also be noted that the identification testimony was not limited to that of the oil delivery man. Penister was identified at trial by Stacy and Duane Taylor, a cousin of Stacy, who was driving the car occupied by Stacy and Penister shortly before the robbery took place.

Admittedly there were inconsistencies in Speth's testimony. His testimony, however, although sometimes contradictory, was not incredible as a matter of law; and without doubt the jury, on the basis of the evidence, could conclude that the testimony of Speth was sufficient to identify Penister as one of the robbers.

Defense counsel also argues that Stacy, in exchange for his testimony against Penister, was offered not only consideration in the sentencing for the crimes he had committed, but also was offered immunity from prosecution for perjury, including any perjury that might occur during the course of the trial of Penister. The state agrees that such a grant of immunity, had it been made, would constitute a gross abuse of discretion and might vitiate Penister's conviction. We conclude, however, from the testimony of both Stacy and Attorney Hayes, who represented Stacy, that the term, "perjury," was never used by the district attorney at the time arrangements were made for Stacy to appear as a state's witness against Penister. The district attorney denied that any such offer had been made and asserted correctly that the evidence does not show that the district attorney either countenanced or encouraged Stacy to perjure himself at Penister's trial.

It is true that Stacy thought that the agreement with the district attorney would permit him to commit perjury. However, there is no evidence to show that this belief had any foundation in fact or was the result of any conduct by the prosecutor's office.

Stacy's belief, however unfounded, is relevant to the credibility of his testimony at trial. Stacy's testimony indicates that he thought he would be permitted to lie. He

repeatedly admitted that he had lied before and in connection with some of the proceedings in the instant case. He conceded that he would commit perjury to get out of jail. His testimony at trial contained a number of internal inconsistencies.

All of these facts were fully revealed to the jury. Stacy was extensively cross-examined, and the jury had an opportunity to determine whether they could place credence on the testimony which connected Penister with the crime. On the basis of the facts revealed at trial, the jury could have chosen to reject Stacy's testimony *in toto,* but it chose not to do so. We have held that, even where a witness is inconsistent and where some of his testimony is incredible and contradictory, the jury is entitled to believe some, all, or none of his testimony.

We said in *Mackowski v. Milwaukee Automobile Mutual Ins. Co.* (1957), 275 Wis. 545, 550, 551, 82 N.W. 2d 906:

". . . the weight to be given to the Kemnitz testimony was for the jury. While some features of it strain one's credulity . . . we cannot say as a matter of law that he was so completely unworthy of belief that his testimony should have been excluded or stricken from the record, or that the jury could not properly believe most of it . . . . Indeed, wilfully false testimony on one point does not require the jury to reject all of the witness' evidence."

The trial judge properly gave the jury instructions covering Stacy's testimony. He instructed the jury that it was the sole judge of credibility and that it should consider the witness' bias, prejudice, or motive for falsifying the evidence. The jury was also instructed that Stacy was an accomplice and that he had been made promises by the state in exchange for his testimony. The jury was instructed:

"[S]uch testimony must be examined and weighed with greater care than the testimony of an ordinary witness

. . . . ordinarily, it is unsafe to convict upon the uncorroborated testimony of an accomplice."

Although the jury could have rejected Stacy's testimony *in toto,* it was properly instructed; and it was within the jury's province to accept or reject all or part of that testimony.

We find no evidence that the prosecution offered Stacy immunity for any perjury that he might commit at Penister's trial, and we cannot conclude that Stacy's testimony, questionable and inconsistent as it was, was incredible as a matter of law.

We further conclude that the evidence of Stacy, of Speth, the oil delivery man, and of Taylor, together with the circumstantial evidence, particularly the presence of the check in Stacy's pocket, which had been altered to substitute Penister as a payee, was sufficient to enable the jury to find defendant guilty of armed robbery beyond a reasonable doubt.

The conviction for carrying a concealed weapon is not challenged except on the grounds of the invalidity of the arrest, which has been discussed above.

Penister also argues that the fifteen-year indeterminate sentence imposed for armed robbery was excessive. He asks this court to review the sentence and to reduce it to five years under the standards set forth in *McCleary v. State* (1971), 49 Wis. 2d 263, 182 N.W. 2d 512. In that case we stated:

". . . this court should review and reconsider an allegedly excessive sentence whenever it appears that no discretion was exercised in its imposition or discretion was exercised without the underpinnings of an explained judicial reasoning process. Where the judicial sentencing discretion is exercised on the basis of clearly irrelevant or improper factors, an abuse of discretion also results." (P. 278)

Nevertheless, we have stated that, as a matter of policy, this court will not interfere with the sentencing dis-

cretion of the trial judge unless it appears that the sentence was imposed without rational basis and the imposition of the sentence constituted an abuse of discretion. A search of the record shows that the sentencing judge, who imposed a term of one-half of the maximum, specifically considered the danger to the community which arises from the crime of armed robbery and he looked to the defendant's past record and presentence report of the Department of Probation. He said:

". . . looking at your overall record, the seriousness, the very great seriousness of the principal crime here, I do hereby sentence you to a term of 15 years.
". . .
"You must consider anytime a Court imposes sentence it not only considers the defendant himself but the overall effect upon society and we cannot have armed robbers on our streets with sawed off shotguns, a weapon which has no other use without taking due notice of it, and hope to discourage others."

The presentence report showed a persistent pattern of anti-social behavior, a course of conduct of attempting to mislead his prior probation officers, and the failure of previous attempts on probation. On the basis of past experience under supervision, the probation officer recommended a period of incarceration. Furthermore, the record in this case reveals that two reputable attorneys who had been appointed by the court to represent Penister in these very proceedings asked to withdraw because of successive threats made by Penister against them.

The trial judge considered both the nature of the crime and the past record of the defendant in determining to sentence the defendant to half of the maximum term.

The sentence is not on its face excessive, and the process by which the sentence was imposed indicates that the judge rationally reached a conclusion on the basis of the facts in the record. We cannot conclude that the sentence imposed constituted an abuse of discretion.

The initial arrest of Penister was justified by the reasonable suspicion of the officers, the evidence was sufficient to support the conviction beyond a reasonable doubt, and the sentence was imposed only after the exercise of appropriate judicial discretion.

*By the Court.*—Judgment and orders affirmed.

ROBERT W. HANSEN, J. *(concurring)*. The writer concurs, finding the protective search for weapons here to meet the test set forth in *State v. Chambers* (1972), 55 Wis. 2d 289, 198 N.W. 2d 377, that test taken from *Adams v. Williams* (1972), 407 U.S. 143, 92 Sup. Ct. 1921, 32 L. Ed. 2d 612.

ABRAHAMSON, J. *(dissenting in part)*. Reading the record as a whole, I find that the police officers, prior to searching Penister in the tavern, did not have reasonable suspicion that he was one of the armed robbery suspects. Penister's description had never been given in connection with the weapons complaint; Penister made no suspicious moves when the police entered; he was not known to the police as a dangerous felon; and the act of carrying a concealed weapon, of which Stacy alone was suspected, is not the kind of crime one might expect to be shared with an accomplice. On my reading of the record, Penister was searched because of his proximity to and similar appearance to Stacy and because a search of Stacy revealed a sawed-off shotgun. Under the circumstances, the officers did not have reasonable suspicion which justified the search of Penister, and therefore the search was impermissible.