STATE, Appellant, v. CHAMBERS, Respondent.

*No. State 176. Argued June 7, 1972.—Decided June 30, 1972.*
(Also reported in 198 N. W. 2d 377.)

292

For the appellant the cause was argued by *Thomas G. Hetzel,* assistant district attorney of Kenosha county, with whom on the briefs were *Robert W. Warren,* attorney general, and *Burton A. Scott,* district attorney.

For the respondent there was a brief by *Vaudreuil & Vaudreuil* of Kenosha, and oral argument by *Leo Vaudreuil.*

ROBERT W. HANSEN, J. Was the police officer entitled to interrogate a person who had come into the apartment where illegal drugs had been found during a valid consent search of such premises? Was there a reasonable basis for the officer's suspicion that such person carried a weapon?

Both questions must be answered affirmatively to make the pat-down of the defendant's outer jacket pockets by the police officer proper, prudent and permissible. Each question is to be answered in the light of the surrounding circumstances. That is made clear in a very recent decision of the United States Supreme Court.[1]

[1] *Adams v. Williams* (1972), 407 U. S. 143, 92 Sup. Ct. 1921, 32 L. Ed. 2d 612.

Even though there is no probable cause to make an arrest, *Adams* makes clear that a police officer may "in appropriate circumstances" detain a person for interrogation.[2] In fact, *Adams* holds that it may be "the essence of good police work" to briefly stop a suspicious individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."[3] A police officer "making a reasonable investigatory stop" is not denied "the opportunity to protect himself from attack by a hostile suspect."[4] *Adams* states clearly, ". . . So long as the officer is entitled to make a forcible stop and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose."[5] Whether or not the carrying of concealed weapons is a criminal offense makes no difference for the patting down is not to discover evidence of a crime

[2] *Id.* at page 145, stating: "In *Terry* this court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for the purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.'" (Citing *Terry v. Ohio* (1968), 392 U. S. 1, 22, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889.)

[3] *Id.* at pages 145, 146, stating: "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may .be the essence of good police work to adopt an intermediate response. See *id.*, at 23. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. . . ." (Citing *Terry v. Ohio, supra,* at pages 21, 22.)

[4] *Id.* at page 146, holding: "The court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. . . ."

[5] *Id.* at page 146. (Citing *Terry v. Ohio, supra,* at page 30.)

but to allow the officer to pursue his investigation without fear of violence.[6]

We deal here with a very limited frisking or pat-down, no more than a patting of the hands on the outside of jacket pockets to determine if they contained a gun or blackjack or other weapon. That it was a frisking for weapons, no more, is clear, not only from the officer's testimony, but from the nature of the patting down. If the officers had been looking for a marijuana cigarette or heroin capsule concealed in the jacket pockets, a pat on the outside of the pockets would hardly have revealed the presence of either cigarette or capsule.

That this was a bona fide pat-down for weapons and not in any way a search of the person for illegal drugs [7] is additionally established by what transpired earlier. When the two police officers went to the apartment to conduct a consent search of the premises, they found eight persons in the apartment. None were searched. All were dressed in casual, summer-type attire. The males were dressed in T-shirts and jeans, the females in blouses and slacks. The officers, one with twelve years police experience, concluded that the casual attire provided no place of concealment for articles as bulky as revolvers or zip guns. So no pat-down of the eight took place. Also, the two police officers stated to those present that they would not be searched for dangerous

---

[6] *Id.* at page 146, stating: ". . . The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law. . . ." (Citing *Terry v. Ohio, supra,* at page 30.)

[7] *See: State v. Dodd* (1965), 28 Wis. 2d 643, 647, 137 N. W. 2d 465, where this court doubted that a weapons search was only that, observing: ". . . A search for weapons in the clothing to be worn by Dodd would hardly include such a minute search of a pocket in a shirt as would disclose two seeds of marijuana. . . ."

drugs. In fact, the officers stated that they would leave the room so that any of the eight, if they had dangerous drugs on their person, could toss them on the floor while the officers were out of the room. They certainly were not required to do this, but they did.

It was only when the ninth person, wearing a bulky jacket with two large, slash-type pockets, walked into the kitchen that what this court has termed "necessarily swift action predicated upon the on-the-spot observations of the officer" [8] occurred. The trial court, holding the pat-down improper, found controlling the fact that the person patted down was ". . . not under arrest nor specifically charged with any offense at the time." That is not the test. Neither arrest nor being charged with an offense is a prerequisite to a protective pat-down for weapons, as *Adams* makes crystal clear.[9]

Under the *Adams* holding, it is the surrounding circumstances that one looks to to determine if there was a reasonable basis for investigating or interrogating and for the frisking or patting down of the person stopped for questioning.[10] As the nation's highest tribunal said on another point in *Adams,* "One simple rule will not cover every situation." [11] Circumstances can alter cases, and here it is to the particular circumstances of this particular case that we must direct our attention.

Moreover, it is to the totality of circumstances present, and inferences properly drawn therefrom, that we must

---

[8] *Warrix v. State* (1971), 50 Wis. 2d 368, 375, 184 N. W. 2d 189, quoting *Terry v. Ohio, supra,* as having ". . . justified the 'stop-and-frisk' procedure on pragmatic grounds because it involved 'an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer . . . .' "

[9] *Adams v. Williams, supra.*

[10] *Id.* at page 148, concluding: *"Under these circumstances* the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety and we conclude that it was reasonable. The loaded gun seized as a result of this intrusion was therefore admissible at Williams' trial. . . ." (Emphasis supplied.)

[11] *Id.* at page 147.

look. Did the circumstances here warrant the officer in reasonably concluding that the person who walked into the search scene ought be questioned and in reasonably suspecting that such person was carrying a weapon in his jacket pocket? It is all of the circumstances that are to be considered in determining what was reasonable police procedure in the particular situation.

Here are the surrounding circumstances that, considered together, we hold to render entirely reasonable stopping the defendant for questioning and the preceding of such questioning by the patting of his outside jacket pockets to see if they contained a weapon.

*Fact of search.* When the defendant was patted down for weapons, he had entered an apartment in which the two police officers were conducting a search of the premises. No challenge is made to the validity of that search of the premises. It was made with the consent of the person who rented or leased the apartment searched. At the time of the defendant's entry, the officers had already found a quantity of illegal drugs stored on the premises. The two officers were engaged in the discharge of an official and often enough risky police function. The officers were entitled to take into consideration that, in searches as in arrests, it is not uncommon to encounter violent resistance from those involved or affected.

*Place entered.* The defendant walked into the apartment in which the police had found illegal drugs. He was not stopped on a public street,[12] nor was he entering a purely private home. Exactly as if gambling equipment or prostitutes plying their trade had been found on the premises, the apartment, once the quantity of illegal drugs were found stored in it, became some-

[12] *See: Sibron v. New York* (1968), 392 U. S. 40, 64, 88 Sup. Ct. 1889, 20 L. Ed. 2d 917, stating: "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries."

thing more than someone's private residence. The fact that a premises is a gambling joint, house of prostitution or narcotics den may not be known to the one who walks in, but it is known to the police officers and it is a factor they can consider in reasonably concluding that one who walks into the premises might be armed.

*Manner of entry.* The defendant rang the buzzer, came up the steps, opened the door and walked into the apartment. He did not wait to identify himself nor to be invited to step in. Any inference that he came to this particular premises by mistake or to deliver a pizza pie is rendered untenable by the manner and place of entry. The officers were justified in inferring that the defendant was not paying a first visit and that his lack of formality in entering the place being searched might be far greater than that of a casual visitor coming for the first time to the premises. If this circumstance did not increase the likelihood of his being armed, it certainly increased the likelihood of his using a weapon to block the search, if weapon he had on him. And it is use, not possession, of a weapon that police officers have reason to fear.

*Officers outnumbered.* Ten persons were in the apartment when the officers commenced their consent search of the premises. Two were police officers, and eight were persons who were in the apartment. One was known as a user and seller of illegal drugs. When the defendant arrived, he was the 11th person present. There had been no disorder, other than the disturbing behavior of one person present who went from room to room, locking himself in the bathroom, coming out, and repeating the process. But the fact that the two police officers were thus outnumbered made the danger of disorder and the consequences of a weapon being carried by one of those present greater for the officers and for all others present.

*Manner of attire.* The eight persons found in the searched apartment were attired in light, casual, summer-type clothing. Based on their experience in similar situations, the two police officers concluded that the pockets in such garments could not conceal weapons such as revolvers or firearms. In a sense, they gambled their lives on the conclusion that the eight had no place to conceal a pistol or similar weapon. It was only when the defendant (wearing a heavy, winter-type jacket, with two, large, slash-type pockets) appeared on the scene that the officer concluded a precautionary pat-down was called for to determine if either jacket pocket contained a weapon. It is not the weight or type of material of the jacket that created the possibility that a weapon might be carried. It was the fact that this winter-style jacket had two large pockets, each large enough to conceal a pistol or similar weapon. If the defendant had entered the kitchen wearing a bathing suit, his manner of attire might render unreasonable a police suspicion that he was toting a revolver. Entering attired in a heavy jacket with two obvious places of concealment for a handgun was a factor that the officer was entitled to take into consideration.

*Scope and extent.* What this court has termed the "scope and intensity" of a search is involved in determining whether the police procedure followed was reasonable.[13] Clearly the "scope" of pat-down for weapons is a factor to be considered in judging reasonableness. Here it is clear that no more was attempted than the officer patting the outside of the two large pockets of the jacket that the defendant was wearing. A more limited or circumscribed checking for weapons could hardly be imagined. When the officer's hand encountered the hard, cylindrically shaped object in the jacket pocket, he testified that he believed it to be a revolver, knife or

---

[13] *See: State v. Dodd, supra,* at pages 646, 647.

zip gun. That it was a brass pipe in a plastic bag containing leaves identified as marijuana and a capsule containing a dangerous drug does not reach back to change the purpose or affect the legality of the limited pat-down.

Under these circumstances, and all of them, we hold that the police officer clearly had the right to question the defendant when he walked into the apartment where a valid search was being conducted. We do not see as at all involved defendant's contention that at the time of the walk-in, the police did not arrest him nor did they have any evidence that he had committed any crime. Under the circumstances they did have the right to investigate further, including the right to interrogate the defendant, constitutional assurances given, as to why he had come to the premises being searched.

Having the right to further investigate, the police officer, under the circumstances here, clearly had the right to pat down the outside pockets of defendant's jacket to make sure that he did not have a revolver or other weapon there concealed. The facts and circumstances make entirely reasonable the officer's inference that the defendant represented a danger and was armed.[14] It follows that the police officer here, under these circumstances, was entitled to place his hands on the outside of the pockets of the jacket defendant was wearing to determine if either pocket contained a gun or other dangerous weapon. Having felt the metal, cylindrically shaped object which the officer believed to be a pistol, knife or zip gun, he was entitled to reach into the pocket and remove it. When the hard, cylindrically shaped object developed to be a brass pipe, con-

---

[14] *See: Warrix v. State, supra,* at page 375, where this court held that: "We think the officers *under the facts then available to them* were reasonable in the method of patting down the defendants and in their belief that their action was appropriate and necessary." (Emphasis supplied.)

tained in a plastic bag with leaves chemically identified to be marijuana and a capsule chemically determined to contain a dangerous drug, the pipe, marijuana and vial were properly in police possession as the result of an entirely reasonable and constitutionally permissible police procedure. As such, they were properly admissible as evidence at trial.

The only case we have found in which the circumstances are substantially similar to those listed is a Colorado case. There, during a valid search of premises for drugs, the defendant came to the premises and entered. The police officer informed the defendant that he was going to frisk him for weapons, and, when defendant put his hand back in his pocket, the officer jerked the hand out of the pocket. As he did so, a plastic bag containing marijuana protruded from the pocket. Holding the frisking reasonable and the evidence obtained admissible, the Colorado Supreme Court held:

"It is certainly reasonable for a police officer conducting a legal search of premises which he believes to be involved in the sale of narcotics to frisk occupants and those coming to the house for weapons in order to protect himself against the use of such weapons." [15]

We agree with the result and reasoning of the Colorado decision.

A contrary holding would expose law officers in this state to a heightened risk of loss of life or serious injury in the conducting of valid searches and the performance of their official duties. This court, some years ago, noted that: "In a recent California case the court took note of numerous attacks which have been made upon law-enforcement officers," [16] and, for itself, concluded:

[15] *People v. Nefzger* (Colo. 1970), 476 Pac. 2d 995, at page 996.
[16] *Barnes v. State* (1964), 25 Wis. 2d 116, 130 N. W. 2d 264, at page 125, citing *People v. Davis* (1961), 188 Cal. App. 2d 718, 722, 10 Cal. Rptr. 610.

"It seems to us that the protection of the lives of our law-enforcement officers outweighs the slight affront to personal dignity of the arrested person who undergoes a search for weapons." [17]

In the years since the *Barnes* and *Davis Cases* were written, attacks upon police officers, including their assassination while engaged in the performance of their official duties, have increased astronomically. [18] That fact and the factor of clear and present danger to law officers searching premises, particularly for narcotics, is not to be ignored in evaluating the reasonableness of a precautionary pat-down for weapons under the circumstances of the case before us. A police officer in such circumstances ought not to have to wait until a pistol is pointed and the trigger pulled to have his suspicion confirmed that the person on the premises of a place being searched was armed. It is not too long ago that travelers boarding a jet airliner would certainly have been affronted by being frisked or electronically tested for weapons concealed on their person. With the wave of skyjackings and the wholesale massacre of plane passengers at Lydda Airport in Tel Aviv, Israel, it is likely that they nowadays welcome precautionary steps to insure that those who boarded the plane with them did not come armed with dangerous weapons. Under the circumstances here, the police officers searching for and finding illegal drugs on a certain premises were entitled to assure themselves that persons on or coming onto such premises were not armed with a dangerous weapon. To hold otherwise would be to sign

[17] *Id.* at page 125.
[18] In *Adams v. Williams, supra,* the United States Supreme Court noted in fn. 3, at page 148: "Figures reported by the Federal Bureau of Investigation indicate that 125 policemen were murdered in 1971, with all but five of them having been killed by gunshot wounds. . . ."

a judicial death warrant for law officers assigned in the future to conduct searches for illegal drugs and certain to encounter the same situation faced by the two Kenosha police officers in this case.

*By the Court.*—Order reversed and cause remanded with directions to deny the motion to suppress evidence and to proceed with trial.

WILKIE, J. *(dissenting)*. I respectfully dissent because this search was unreasonable. While I support the general proposition that police need protection when they are suspicious of an individual, the record here simply does not support the conclusion that the police officer conducting the search had any suspicion whatsoever that this defendant was violating any laws or was in any way dangerous when he entered the room. This fact distinguishes the present appeal from the cases relied upon by the majority. *Adams v. Williams,*[1] the most recent United States Supreme Court decision relied on by the majority, concerned a situation in which the police had suspicions of the defendant. In *Adams,* the court extended *Terry v. Ohio,*[2] to say that information from an informant may constitute that suspicion. Until there is suspicion, therefore, *Adams* and *Terry* do not come into the picture. In this case there simply was no suspicion and thus the rationale of *Terry, Adams,* and the other cases cited is not relevant.

The county court was clearly incorrect in holding that a defendant must be under arrest or charged at the time of the search in order for it to be valid. The majority would order the trial court to deny the motion to suppress. But there are no facts to support the majority's determination. The consistent, unrefuted, and

---

[1] (1972), 407 U. S. 143, 92 Sup. Ct. 1921, 32 L. Ed. 2d 612.

[2] (1968), 392 U. S. 1, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889.

definite statements by the police all point to the conclusion that they had no suspicion of this defendant. I would affirm the trial court's order on the basis of this testimony.[3]

I have been authorized to state that Mr. Chief Justice HALLOWS and Mr. Justice HEFFERNAN join in this dissent.

[3] For a detailed discussion of the law relating to weapon searches of individuals not suspected of crimes, *see People v. Superior Court of Los Angeles County* (1972), 7 Cal. 3d 186, 101 Cal. Rptr. 837, 496 Pac. 2d 1205, wherein the Supreme Court of California declared unconstitutional a weapons search of a person stopped for a traffic violation when the police admitted that they had no cause to believe that the person searched had committed a crime or was carrying a weapon. *See especially* 101 Cal. Rptr. at page 852.