STATE, Respondent, v. WILLIAMSON, Appellant.

*No. State 100. Argued March 28, 1973.—Decided May 1, 1973.*
(Also reported in 206 N. W. 2d 613.)

For the appellant there were briefs by *Shellow & Shellow* and *D. Winthrop Hass,* all of Milwaukee, and oral argument by *Mr. Hass.*

For the respondent the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

ROBERT W. HANSEN, J. On appeal, the defendant challenges:

(1) The stopping-and-frisking which led to police seizure of the loaded .38-caliber revolver found in the glove compartment of his automobile; and (2) the sufficiency of the evidence to convict him of the crime of carrying a concealed weapon, contrary to sec. 941.23, Stats.

(1) *Stopping-and-frisking.*

The defendant questions the propriety of (1) stopping the defendant; (2) frisking his person for weapons; and (3) taking the revolver from the glove compartment.

Such stopping, frisking and finding must have been reasonable under the circumstances to be upheld.[1]

*The stopping.* Was it reasonable under the circumstances for the police to stop the car of the defendant, thereby detaining the driver for interrogation?

According to police testimony, the stopping of defendant's car was preceded by the following suspicion-arousing circumstances:

At about 11 p. m., the police officers in a squad car observed the defendant driving a 1962 Chevrolet in a westerly direction in the 1100 block of West Burleigh Street. There was another person in the car. The defendant drove the car west on Burleigh to North 12th Street, there turning right and heading north. Proceeding north for a short distance, the defendant turned right on West Ring Street, heading east for a short distance and then pulling to the curb in the 1000 block of West Ring Street. The police squad car passed the stopped car of the defendant. Looking back, the police officer saw that the automobile's engine was still running. He observed the interior lights of the car go on and the doors partially open. The police officer concluded that the defendant had pulled his car to the curb and was waiting to see what the police were going to do. After passing defendant's car, the police squad car continued on West Ring Street to North 10th Street, turned left and, after going about 100 feet, turned around and headed back toward West Ring Street. As the squad car approached West Ring Street, the police officers observed that defendant's automobile began to pull away from the curb. Reaching the intersection of 10th and Ring, the squad car turned right on ring, heading back toward defendant's automobile. Thereupon, defendant drove his car back to the curb and stopped.

[1] *State v. Chambers* (1972), 55 Wis. 2d 289, 293, 198 N. W. 2d 377, citing *Adams v. Williams* (1972), 407 U. S. 143, 92 Sup. Ct. 1921, 32 L. Ed. 2d 612.

The squad car crossed lanes to stop in front of defendant's automobile.

As to the rule of law applicable, it is clear that, even though there is no probable cause to make an arrest, a police officer may "in appropriate circumstances" detain a person for interrogation.[2] It has been termed "the essence of good police work" to briefly stop a suspicious individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." [3]

Given this rule and these circumstances, including the turning and stopping, starting and pulling back to the curb when the squad car approached, it was entirely reasonable for the police officers to stop defendant's car for the purpose of interrogating the driver as to who he was and why he had driven the car as he had. The trial court found the stopping to have been reasonable under these circumstances. The circuit court agreed, and so do we.

*The frisking.* Was it reasonable under the circumstances for the police to pat the pockets of the defendant to determine whether he was armed and dangerous?

[2] *Id.* at page 294, citing *Adams v. Williams, supra,* at page 145, stating: " 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for the purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' " (Citing *Terry v. Ohio* (1968), 392 U. S. 1, 22, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889.)

[3] *Id.* at page 294, citing *Adams v. Williams, supra,* at pages 145, 146, stating: " 'The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. See *id.,* at 23. [*Terry v. Ohio, supra*] A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. . . .' " (Citing *Terry v. Ohio, supra,* at pages 21, 22.)

According to police testimony, the frisking of the person of defendant for weapons was preceded by the following sequence of events:

The police officer got out of the squad car, and walked to the driver's side of defendant's automobile. The car window was open. The officer asked the defendant if he had a driver's license. The defendant stated that he did, and was asked to produce it. The defendant stated he did not have it with him. The officer then asked the defendant for some identification, and the defendant stated he had none. The officer then asked the defendant who owned the automobile, and the defendant stated that it belonged to a girl friend. The police officer then told the defendant to step out of the automobile. The defendant did, and the officer then patted him down, placing his hands on the outer pockets of defendant's trousers. (Defendant was wearing a shirt-sweater and overall-type trousers.) The officer felt hard objects in defendant's right trousers pocket which the officer believed to be bullets. He asked the defendant to remove the objects from the pocket, and they turned out to be six .38-caliber cartridges.

Under the law we have here what has been termed "a very limited frisking or pat-down" [4] to "allow the officer to pursue his investigation without fear of violence." [5] It is clearly the law that a police officer "making a reasonable investigatory stop" is not to be

---

[4] *Id.* at page 295, stating, "We deal here with a very limited frisking or pat-down, no more than a patting of the hands on the outside of jacket pockets to determine if they contained a gun or blackjack or other weapon. . . ."

[5] *Id.* at page 295, citing *Adams v. Williams, supra,* at page 146, stating: " '. . . The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law. . . .' " (Citing *Terry v. Ohio, supra,* at page 30.)

denied such "opportunity to protect himself from attack by a hostile suspect." [6]

Given this rule and the circumstances here present, including the time of day and the fact that the defendant was driving without a driver's license on his person, and without any identification, the police officer was justified in his precautionary pat-down to determine if the defendant was armed and dangerous. The trial court so held. The circuit court agreed, and so do we.

*The finding.* Was it reasonable under the circumstances for the police to check the driver's seat and unlocked glove compartment for the gun after they had found the bullets?

Once again, it is "all of the circumstances that are to be considered in determining what was reasonable police procedure in the particular situation." [7]

The police testimony, which the trial court was entitled to believe, established these circumstances surrounding the finding of the loaded .38-caliber revolver:

Finding bullets but no gun on the person of the defendant, the police officer asked the defendant if he could look in the car and the defendant stated, "I don't care." The police officer had the defendant move away from the car door where he had been standing. The officer reached into the automobile and under the driver's seat, not finding a weapon. The officer then reached into an unlocked glove compartment in the center of the dashboard and found a loaded .38-caliber revolver. Defendant's companion testified he was in the automobile until after the loaded revolver was found. The police

---

[6] *Id.* at page 294, citing *Adams v. Williams, supra,* at page 146, stating: " 'The court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. . . .' "

[7] *Id.* at page 297.

officer testified that he thought the companion was outside the car when the gun was found.

On this record and such testimony, the trial court, on request of the state but after finding the defendant guilty, made a finding that the police officer had received permission to search the car. We would not set aside such finding of fact. What specific words constitute consent to search relate to the circumstances under which they are uttered. Here the defendant said, "I don't care," when asked if the police officer could look in the car. Where, in somewhat similar circumstances, a defendant answered, "It's not my car. Do whatever you want," one state found sufficient consent.[8] Valid consent to search an automobile trunk was found where a defendant, in response to a police request to search, answered, "The keys are in the switch." [9] There is nothing here that would raise the issue of voluntariness as to the consent given.[10]

However, even if consent had not been given, it is clear here that it was reasonable under these circumstances for the police to look for the gun in the car after they had found the bullets in defendant's pocket. Finding the bullets made it not unreasonable to believe and to fear that the gun they fitted was nearby. A frisk of the person of a suspect has been defined as "a weapons search limited in scope to this protective purpose." [11]

[8] *Boatright v. State* (Tex. Crim. App. 1971), 472 S. W. 2d 765, 767.

[9] *Payton v. State* (1971), 47 Ala. App. 347, 349, 254 So. 2d 351, 353.

[10] See: *Gautreaux v. State* (1971), 52 Wis. 2d 489, 190 N. W. 2d 542, for review of factors to be considered in determining whether consent was voluntary.

[11] *State v. Chambers, supra,* at page 294, citing *Adams v. Williams, supra,* at page 146, holding, " '. . . So long as the officer is entitled to make a forcible stop and has reason to believe that the suspect is armed and dangerous, he may conduct *a weapons search limited in scope to this protective purpose.*' " (Citing *Terry v. Ohio, supra,* at page 30.) (Emphasis supplied.)

The purpose referred to protection of the lives of law enforcement officers. Here, once having discovered the bullets, that protective and precautionary purpose was hardly fully served by determining that the gun they fitted was not on the person of the defendant. Where the officer reached under the front seat, the defendant, standing by the door or the occupant sitting in the front seat, could also have reached. Given a quick break for the weapon, the driver by the door or the occupant in the car, could have reached into the unlocked glove compartment as did the officer.

In an analogous situation, a defendant and two companions were stopped for a minor traffic violation and, after stopping the vehicle, the police officers discovered a cartridge clip. The court held that, at that point and under those circumstances, there was probable cause to believe that the occupants of the car might have a dangerous weapon, and that a search for it was proper.[12] Likewise, in the case before us, finding the bullets gave probable cause to believe the gun they fitted was nearby, and made entirely reasonable checking the front seat and glove compartment to look for the gun. On the facts here, such weapons search was a reasonable police precaution clearly limited in scope to the protective purpose involved. As this court once observed, ". . . It seems to us that the protection of the lives of our law-enforcement officers outweighs the slight affront to personal dignity of the arrested person who undergoes a search for weapons. . . ."[13] Here checking or searching the car for the gun after the bullets were found on

[12] *Kendrick v. Nelson* (9th Cir. 1971), 448 Fed. 2d 25. *See also: United States v. Wheeler* (D. C. Cir. 1972), 459 Fed. 2d 1228, where frisk of a defendant disclosed five .38-caliber bullets and search revealing gun under the front seat of the car was held within the scope of weapons search and proper.

[13] *Barnes v. State* (1964), 25 Wis. 2d 116, 125, 130 N. W. 2d 264.

the person of the defendant involved no affront at all, and was entirely reasonable under the circumstances.

(2) *Burden of proof.*

The defendant also contends the state did not meet its burden of proof because it did not establish that the defendant was not a "peace officer." The section of the statute under which he was convicted provides: "Any person except a peace officer who goes armed with a concealed and dangerous weapon shall be imprisoned not more than one year in the county jail." [14] Another section defines a "peace officer" as "any person vested by law with a duty to maintain public order or to make arrests for crime, whether that duty extends to all crimes or is limited to specific crimes." [15]

So the defendant argues that it was incumbent upon the state to establish that the defendant was not a "peace officer." This goes beyond being a member of a police or sheriff's force in this state. There are over 1,200 separate towns in this state, each of which may have as many as three constables. [16] Every village in the state may have a marshal, [17] and a constable. [18] Even village presidents and trustees are designated as officers of the peace by statute. [19] Each city may have one or more constables. [20] Additionally, there are state forest rangers, emergency fire wardens, conservation wardens, and others with arrest powers, [21] prison guards, campus police and town policemen and others appointed by town boards. [22] The list is not complete, but it makes

[14] Sec. 941.23 (1), Stats.
[15] Sec. 939.22 (22), Stats.
[16] Sec. 60.19 (1) (a), Stats.
[17] Sec. 61.28, Stats.
[18] Sec. 61.29, Stats.
[19] Sec. 61.31 (1), Stats.
[20] Sec. 62.09 (1), Stats.
[21] Sec. 26.14, Stats.
[22] Sec. 60.29 (8), Stats.

the burden of proof suggested by defendant difficult to meet.

The state counters that, while the general rule is that the burden of proof is upon the prosecution to prove that a defendant is not within an exception embodied in the enacting clause of a criminal statute,[23] an exception exists where evidence of the exempting fact lies especially within the control of the defendant or peculiarly within his knowledge.[24] We agree. Both the general rule, and the exception, are recognized in this state. This court has stated, "It is undoubtedly the general rule that the state must prove all the essential facts entering into the description of the offense. But it has been held in many cases that when a negation of a fact lies peculiarly within the knowledge of the defendant it is incumbent on him to establish that fact. . . ."[25] The question of whether a defendant is a "peace officer" must be raised by the defendant as an affirmative defense; the situation here comes under the exception, not the general rule as is made clear by *Kreutzer*.

*By the Court.*—Orders affirmed.

---

[23] 29 Am. Jur. 2d, *Evidence,* p. 185, sec. 154.

[24] *Id.* at pages 185–187.

[25] *Kreutzer v. Westfahl* (1925), 187 Wis. 463, 478, 204 N. W. 595.