STATE of Wisconsin, Plaintiff-Appellant,

v.

Michael T. MORGAN, Defendant-Respondent-Petitioner.

Supreme Court

*No. 93–2089–CR. Oral argument September 7, 1995.—Decided November 21, 1995.*

(Also reported in 539 N.W.2d 887.)

For the defendant-respondent-petitioner there were briefs by *William J. Tyroler*, assistant state public defender; *Calvin Malone* and *Rebholz, Auberry &*

*Malone*, Milwaukee and oral argument by *Calvin Malone*.

For the plaintiff-appellant the cause was argued by *Marguerite M. Moeller*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

Amicus curiae brief was filed by *Pamela Moorshead* and *Adelman, Adelman, and Murray, S.C.*, Milwaukee for the American Civil Liberties Union of Wisconsin Foundation and National Association for the Advancement of Colored People (NAACP).

ROLAND B. DAY, C.J.   This is a review of an unpublished court of appeals decision reversing an order of the circuit court for Milwaukee County, the Honorable John A. Franke, suppressing a handgun and cocaine base found on petitioner Michael T. Morgan (Morgan). Morgan was charged with carrying a concealed weapon, contrary to Wis. Stat. § 941.23 (1991-92), and possession of cocaine while armed, contrary to Wis. Stat. §§ 161.14(7)(a), 161.41(3m), 161.48, 939.63 (1991-92). Morgan challenged the legality of the pat-down search that produced the evidence leading to the charges. At a hearing on May 28, 1993, the circuit court granted the defendant's motion to suppress the evidence. The court of appeals, in an unpublished opinion, reversed the circuit court. We hold that the pat-down search did not violate Morgan's right under the federal and state constitutions to be free from unreasonable searches. Accordingly, we affirm the court of appeals.

The following facts are taken from the preliminary hearing and suppression hearing in this matter, and are undisputed. City of Milwaukee Police Officers Peter Mulock (Mulock) and Brent Tidquist (Tidquist)

were on patrol at four a.m. on March 1, 1993. Officers Mulock and Tidquist were driving in a squad car near Capitol Drive in Milwaukee, an area which Officer Mulock described as a "fairly high-crime-rate area." Officer Mulock also noted that "there was not a whole lot of traffic" on the street at that time. Officers Mulock and Tidquist observed a vehicle containing three males driving out of an alley. The car then made several turns in the space of a few city blocks, and entered another alley. Having observed that the car's license plates were expired, the officers engaged the emergency lights on their squad car and stopped the vehicle. Officer Mulock then approached the car and asked Morgan (the car's driver) for his operator's license. Morgan rapidly checked his pockets and wallet, and searched some of his pockets several times; however, he was unable to locate the license. According to Officer Mulock, Morgan "appeared nervous" while searching for his license. Officer Mulock testified at the suppression hearing:

> Q:   Now, Officer Mulock, not that this has ever happened, when I'm pulled over, I act a little nervous too. Is this anything—anymore [sic] unusual than the usual person stopped by the police?
>
> A:   I think so. Yes, it was.
>
> Q:   What was different about it?
>
> A:   Just the look on his face. He just appeared nervous and the way he was checking his pockets. He was doing it extremely fast.

Morgan did in fact possess a license, which was discovered in a later search of his wallet incident to arrest.

Officer Mulock then asked Morgan to step out of the vehicle, and performed a pat-down search on Morgan. In the course of the pat-down search, Officer

Mulock discovered a loaded .22-caliber pistol in Morgan's coat pocket. Officer Mulock placed Morgan under arrest and conducted a custodial search of Morgan's person which discovered certain pills (later determined to be diazepam, an antianxiety drug) and a pipe showing traces of cocaine base residue. According to Officer Mulock's testimony, in the event that he had not found the gun on Morgan, the officer would have placed Morgan in the back of his squad car while he or Officer Tidquist conducted various informational inquiries through the squad car's radio, such as an operator's license check and a criminal record check.

Morgan challenged the legality of the pat-down search. Following a suppression hearing, the circuit court granted Morgan's motion to suppress. The circuit court ruled that the pat-down search was impermissible under *State v. Swanson*, 164 Wis. 2d 437, 475 N.W.2d 148 (1991):

> Officer Mulock had every intention to put [Morgan] into some sort of custody and run a check. He was going to put him in the back of the vehicle using his vehicle as something of a tentative booking room, run a check, and then either keep him in custody or release him. I think it's reasonable for a police officer to do that. . . .
>
> . . . .
>
> The only way I think this frisk flies is by the custodial search by the officer. And while it seems to be reasonable, it seems to me that the way *Swanson* is written, it appears to be very deliberate, very careful, very intentional, that what this officer did, at least at the time of the pat down had not yet ripend [sic] into an arrest, that I have to look at this not in the context of what might not have happened in the next few minutes, not even a five or ten minute period, but that the moment, under *Swanson* at

that moment, I don't believe there was an arrest and, therefore, I don't believe that—Well, at least arguably reasonable, the search can fly. . . .

If Officer Mulock had said "What I'm going to do is put you in the back of my car. I'm going to run a check on your license and before I do that, I'm going to search you. You are going to be taken into custody and I'm searching you pursuant to that custody," then I believe that this flies. *Swanson*, at least in dicta, addressed this problem and says the officer's unarticulated plan is irrelevant in determining the question of custody.

The circuit court held that, in the absence of a "clear and specific record," it could not rely on the officer's testimony that the stop occurred in a high-crime neighborhood in determining the legality of the search. In addressing the other factors the officer raised as justifying the search, the circuit court stated:

While the time of night and the nervousness of the subject and the number of occupants are all factors that are pertinent in deciding whether there's a sufficient basis to conduct the pat down, they're not enough by themselves. And together here there's really nothing more than a routine traffic stop. People who were stopped with expired plates and can't find their licenses are often nervous . . . and I don't find that there was any nervousness that was not easily attributable to the fact [Morgan] could not find a license. The fact that he actually did have his license on him is not important in assessing what the officer did but it's important in assessing the credibility of what happened here and I'm satisfied based on the officer's own testimony in that fact that what he was observing was a person nervously trying to come up with their driver's license and thinking it's there and not being able to find it.

The court of appeals reversed, holding that the pat-down search was permissible because the totality of the circumstances justified a protective search for weapons. The court of appeals held that the circuit court had erroneously relied on *Swanson* in granting the defendant's motion to suppress; the court of appeals stated that *Swanson* held a search invalid because it had exceeded its permissible scope, and not because the officer had failed to inform the suspect of his intention to place the suspect in his squad car. The court of appeals then held that the search of Morgan was supported by articulable facts in the record, including

> the "fairly-high-crime-rate area"; Morgan's driving in two alleys at approximately 4:00 a.m.; Morgan's nervous and unsuccessful efforts to produce a driver's license upon request; and Morgan's apparent violation of the traffic law by driving without a license. We also note that Officer Mulock and his partner were outnumbered by the three occupants of the car.

The court of appeals concluded: "While none of these factors in isolation necessarily would justify a frisk for weapons, and although the trial court noted the lack of a 'clear and specific record' regarding whether the area was one of high crime, in combination they provide ample justification."

The Fourth Amendment to the United States Constitution and Article I, § 11 of the Wisconsin Constitution guarantee citizens the right to be free from "unreasonable searches."[1] This court, in constru-

---

[1] The Fourth Amendment to the Constitution of the United States provides:

ing Article I, § 11 of the Wisconsin Constitution, consistently follows the United States Supreme Court's interpretation of the Fourth Amendment. *State v. Betterly*, 191 Wis. 2d 407, 417, 529 N.W.2d 216 (1995). Upon review of an order granting suppression, this court will uphold the trial court's findings of fact unless they are against the "great weight and clear preponderance of the evidence." *State v. Kiper*, 193 Wis. 2d 69, 79, 532 N.W.2d 698 (1995) (quoting *State v. Richardson*, 156 Wis. 2d 128, 137, 456 N.W.2d 830 (1990)). However, deciding whether a search is unreasonable is a question of law that this court reviews without deference to the lower courts. *Betterly*, 191 Wis. 2d at 416-17.

A pat down, or "frisk," is a search. *State v. Guy*, 172 Wis. 2d 86, 93, 492 N.W.2d 311, 314 (1992), *cert. denied*, 113 S. Ct. 3020 (1993) (citing *Terry v. Ohio*, 392 U.S. 1, 16-17 (1968)). The Fourth Amendment prohibits only unreasonable searches; in determining whether a search is reasonable, this court balances the need for the search against the invasion of the suspect's privacy entailed in the search. *Id.* at 93. Pat-down

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized.

Article I, § 11 of the Wisconsin Constitution provides:

**Searches and seizures.** SECTION 11  The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

searches are justified when an officer has a reasonable suspicion that a suspect may be armed. *Id.* at 94. The officer's reasonable suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Richardson*, 156 Wis. 2d at 139 (quoting *Terry*, 392 U.S. at 21). The test is objective:

> [T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Guy*, 172 Wis. 2d at 94 (quoting *Terry*, 392 U.S. at 27). Finally, the determination of reasonableness is made in light of the totality of the circumstances known to the searching officer. *Richardson*, 156 Wis. 2d at 139-40.

■

Morgan argues that the pat-down search conducted by Officer Mulock was not supported by articulable facts giving rise to a reasonable belief that Morgan was armed. We hold that an officer making a *Terry* stop need not reasonably believe that an individual is armed; rather, the test is whether the officer "has a reasonable suspicion that a suspect may be armed." *Guy*, 172 Wis. 2d at 94 (citing *Terry*, 392 U.S. at 30); *see also Terry*, 392 U.S. at 27 ("The officer need not be absolutely certain that the individual is armed . . . ."). In this case, then, we look to the totality of the circumstances known to Officer Mulock in determining whether an officer in his position would reasonably

suspect that Morgan might be armed. *See Richardson*, 156 Wis. 2d at 144 (test for frisk is reasonable suspicion under totality of circumstances).

Morgan claims that the court of appeals disregarded the circuit court's findings of fact in using the high-crime nature of the area as a factor justifying the search. However, the record reveals that the circuit court did not make a factual finding that the area was not a high-crime area. The circuit court stated in making its ruling:

> I think it's absolutely reasonable for police officers to consider where they are. It's just not the same in Riverhills [sic] as it is in other parts of town. But if the state wants the Court to rely on a high-crime area theory in justifying a *Terry* pat down, there has to be a clear and specific record made.
>
> I've discussed this issue at length and reviewed the applicable cases and reviewed the problems that we will face if we simply say whenever police are in a high-crime area, they have the right to frisk. Maybe that's reasonable in this day and age but if it's going to be done, it's going to have to be done with some clear and specific rules which we don't have right now. We have *Terry*. *Terry* doesn't allow it . . . .

The circuit court did not make a finding that the area was not high-crime; instead, it ruled that its reading of *Terry* did not allow the consideration of the high-crime nature of an area as a factor justifying a search. The court of appeals in this case was not disregarding the circuit court's findings of fact in considering the high-crime area in its analysis. The court of appeals, like this court, was making its de novo determination of the reasonableness of the search, a question of law

reviewed without deference to the lower courts. *Betterly*, 191 Wis. 2d at 416-17.

Like the court of appeals, we find that an officer's perception of an area as "high-crime" can be a factor justifying a search. Professor LaFave notes that "the area in which the suspect is found is itself a highly relevant consideration" in justifying a search, and that the cases "most frequently stress that the observed circumstances occurred in a high-crime area." 3 Wayne R. LaFave, *Search and Seizure* § 9.3(c), at 456 (2d ed. 1987). In *United States v. Michelletti*, 13 F.3d 838, 844 (5th Cir. 1994) (en banc), *cert. denied*, 115 S. Ct. 102 (1994), the court noted: "[The searching officer] expressed concern that he was patrolling a high crime area of town . . . . The location in which suspicious behavior occurs, like the time of day, is among the facts that generate reasonable inferences as to the necessary police response to the behavior." *See also United States v. Sharpe*, 470 U.S. 675, 682 n.3 (1985) (noting that presence of vehicles in an area "known to be frequented by drug traffickers" was a factor justifying investigative stop); *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984) ("The reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely.").

State supreme courts have also noted the high-crime nature of an area in determining the legality of a search. In *People v. Souza*, 885 P.2d 982 (Cal. 1994), the California Supreme Court relied on an officer's description of an area as high-crime as a factor in upholding a search. Citing *Sharpe*, 470 U.S. at 682-83 n.3, the court stated "[a]n area's reputation for criminal activity is an appropriate consideration in assessing whether an investigative detention is reasonable under

the Fourth Amendment." *Souza*, 885 P.2d at 992. Recent decisions in several states endorse the use of an area's reputation as a factor. *See State v. Dean*, 645 A.2d 634, 636 (Me. 1994); *Commonwealth v. Fraser*, 573 N.E.2d 979, 982 (Mass. 1991); *State v. Valentine*, 636 A.2d 505, 513 (N.J. 1994). Both the State in this case and Professor LaFave note other jurisdictions conforming to the rule. *See LaFave, supra*, § 9.3(c), at 456-57 n.194 (citing, *inter alia, People v. Cobbin*, 692 P.2d 1069 (Colo. 1984); *State v. Freeman*, 414 N.E.2d 1044 (Ohio 1980); *Commonwealth v. Ellis*, 335 A.2d 512 (Pa. Super. Ct. 1975); *State v. Halstead*, 414 A.2d 1138 (R.I. 1980); *State v. Choat*, 363 S.E.2d 493 (W. Va. 1987)).

Morgan argues that the fact that Morgan was in a supposedly high-crime area should not be sufficient to justify the search, or all residents of high-crime areas would be denied the protections of the Fourth Amendment. We recognize, as did the court in *People v. Bower*, 597 P.2d 115, 119 (Cal. 1979), that many persons "are forced to live in areas that have 'high crime' rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas." Furthermore, Professor LaFave warns that "simply being about in a high-crime area should not of itself ever be viewed as a sufficient basis to make an investigative stop." LaFave, *supra*, § 9.3(c), at 457-58. However, that is not the case here, because it is clear from the record that Officer Mulock, in making a determination that Morgan might have been armed, did not rely solely on the fact that he observed Morgan in what the officer termed a "fairly high-crime-rate area." Officer Mulock had seen Morgan's car leaving and entering two alleys in rapid succession. Officer Mulock also knew that Morgan was

driving a car with expired license plates, and observed Morgan nervously fail to locate his operator's license. Morgan was driving at four a.m. in a lightly-trafficked area. The combination of these facts, not the mere fact that Morgan was in a "fairly high-crime-rate area," led to the search.

In *State v. Williamson*, 58 Wis. 2d 514, 206 N.W.2d 613 (1973), this court found an officer's pat-down valid on substantially similar facts. As in the instant case, the officer in *Williamson* stopped the suspect's car after observing an irregular pattern of driving, and the driver of the car could not produce a driver's license. The stop occurred at 11 p.m. The court held:

> Given . . . the circumstances here present, including the time of day and the fact that the defendant was driving without a driver's license on his person, and without any identification, the police officer was justified in his precautionary pat-down to determine if the defendant was armed and dangerous.

*Id.* at 520. The search in *Williamson* was permissible even without the presence of a factor present in the instant case: the high-crime area.

The court of appeals in the present matter also noted the time at which the stop occurred as a relevant factor. In *State v. Flynn*, 92 Wis. 2d 427, 435, 285 N.W.2d 710 (1979), *cert. denied*, 449 U.S. 846 (1980), this court noted suspect activity occurring "in the early morning hours" as a factor justifying a stop and frisk. Other jurisdictions have considered the time of day to be a factor in forming an officer's articulable suspicion, *see United States v. Holifield*, 956 F.2d 665, 667 (7th Cir. 1992) (noting time of night—9 p.m.—as a factor justifying officer's pat-down search). The United States

Supreme Court, in *Michigan v. Long*, 463 U.S. 1032, 1050-51 (1983), noted that "[t]he hour was late" in upholding a *Terry* search for weapons. Finally, Professor LaFave includes the time of day as one of "several other factors, none of which would individually justify a stopping for investigation, which nonetheless are properly considered together with other suspicious circumstances in determining whether there are grounds for such a brief seizure." LaFave, *supra*, § 9.3(c), at 454. We hold that the time of night—four a.m.—may be considered in determining the legality of the pat-down search of Morgan.

Morgan argues that the court of appeals disregarded a finding of fact by the circuit court in relying on Morgan's perceived nervousness as a factor justifying the search. However, the record shows that the circuit court specifically found that Morgan was nervous; the court, in making its ruling on the defendant's motion, stated that Morgan "nervously and repeatedly went through his wallet and his pockets" while searching for his license. Nonetheless, the circuit court considered Morgan's nervousness not unusual in light of the fact that a person in his situation might expect to be nervous: "People who were stopped with expired plates and can't find their licenses are often nervous . . . I don't find that there was any nervousness that was not easily attributable to the fact he could not find a license." The circuit court, then, made a finding that Morgan was nervous, but discounted the nervousness as a factor justifying the search because it might be explained by Morgan's not being able to find his license. We note that another explanation for Morgan's nervousness might have been the fact that he was carrying a loaded .22-caliber pistol and drug paraphernalia while speaking to an officer of the law. We also note that Officer

Mulock testified that Morgan appeared more nervous than the "usual person stopped by the police." We conclude that the court of appeals, and this court, can use Morgan's nervousness as a factor in its de novo determination of the legality of Officer Mulock's pat-down search.

In the present matter, we agree with the court of appeals that the totality of the circumstances known to Officer Mulock justified a pat-down search of Morgan for weapons. Officer Mulock observed the defendant driving in and out of alleyways at four a.m., in an area which the officer considered a high-crime area, and in a car with an expired license. Officer Mulock observed that the defendant "appeared nervous" while failing to produce his operator's license. According to Officer Mulock's later testimony at the suppression hearing, Morgan was more nervous than the typical person stopped by the police. A reasonably prudent officer in the position of Officer Mulock could have concluded that Morgan might be armed. *Terry*, 392 U.S. at 30 (frisk is justified "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that . . . the persons with whom he is dealing may be armed and presently dangerous"). We find that these facts, taken in combination, were sufficient to cause a reasonable officer to have a reasonable suspicion that Morgan might be armed, and justified the limited pat-down search for weapons which Officer Mulock conducted.

On this review, the State urges us to formulate a "bright-line" rule making all searches justified when a police officer intends to place a suspect in a squad car. We decline. This case is simply resolved on settled Fourth Amendment law.

*By the Court.*—The decision of the court of appeals is affirmed.

JANINE P. GESKE, J. *(concurring).* I fully concur in not only the mandate, but also in the legal analysis presented in the majority opinion. I am writing this concurrence solely to address the dissent.

As noted in the dissent, the "controlling principles of law applicable to this case are firmly established." (Dissent at 218.) These include the principle that the determination of whether an officer had the requisite reasonable suspicion to conduct a pat-down must be based on the totality of the circumstances. This court has often reiterated that "all of the circumstances . . . are to be considered in determining what was reasonable police procedure in the particular situation." *State v. Williamson,* 58 Wis. 2d 514, 520, 206 N.W.2d 613 (1973) (quoting *State v. Chambers,* 55 Wis. 2d 289, 297, 198 N.W.2d 377 (1972)).

A court must employ common sense in its analysis of whether an officer, at the time of the encounter, faced a situation which in its entirety justified a pat-down. Individual factors cannot simply be pulled out and discarded one by one. As the Supreme Court noted, even "*Terry* itself involved a 'series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.'" *United States v. Sokolow,* 490 U.S. 1, 9-10 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 22 (1968)). The facts and inferences relied upon need not all be given equal weight but the totality of the circumstances confronting the officer must at least be considered.

I agree with the dissent's assertion that hindsight cannot constitutionally be employed to justify a pat-

down. (Dissent at 223.) However, neither can hindsight be used to selectively discount facts and circumstances as they were perceived by the officer at the time of the encounter. The totality of circumstances must be examined not from the viewpoint of one sitting on a judicial bench under the cold white lights of a safe courtroom, but rather from the viewpoint of a police officer standing in what he believes to be a "fairly-high-crime" area at 4:00 a.m. next to a car with three men in it, having to make that split-second decision of whether, under the circumstances, to pat-down Morgan for the officer's own safety. Did the officer have a reasonable suspicion Morgan might be armed under the circumstances? At 4:00 a.m. on March 2, Officer Mullock had observed the car exit an alley, make several turns and then enter another alley at a time when there was not much traffic on the road. He had observed a vehicle with expired plates which contained three men. Upon stopping the car, he saw Morgan nervously fail to locate a driver's license despite repeatedly checking his pockets and wallet.

The key, as with any Fourth Amendment question, is reasonableness. *Terry*, 392 U.S. at 19. I agree with the majority in our de novo review that, under the circumstances presented to Officer Mullock at the time of the pat-down, his suspicion that Morgan may be armed was reasonable.

I am authorized to state that Chief Justice Roland B. Day and Justices Donald W. Steinmetz, William A. Bablitch, Jon P. Wilcox and Ann Walsh Bradley join this concurring opinion.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). The controlling principles of law applicable to this case are

217

firmly established. I disagree with the majority opinion's application of these principles to the facts of this case to.determine the validity of a pat-down frisk. The validity of a pat-down frisk is an area of law which is particularly fact sensitive.

I agree with the circuit court's stated reasons for suppressing the evidence. I conclude that the factors the majority relies upon to justify the pat-down search of the defendant do not give rise to the "reasonable suspicion" that the defendant was armed, as required under *Terry v. Ohio*, 392 U.S. 1 (1968). Consequently, I would reverse the decision of the court of appeals and remand the matter to the circuit court with directions to reinstate its suppression order.

I am particularly troubled by the majority opinion's reliance on the fact that the defendant was stopped in what the police officer described as "a high crime area or what I would consider [a] high crime area." The officer failed to state the basis for his portrayal of the area and did not define the geographic locality about which he was speaking.

Many of the cases cited by the majority for its ruling that a police officer's sweeping and imprecise characterization of an area as high crime can justify a pat-down frisk have demanded far more specificity than one can glean from the record in this case.[1]

---

[1] *See, e.g., United States v. Sharpe*, 470 U.S. 675, 677 (1985) (stop lawful in area under surveillance for suspected drug trafficking); *United States v. Rickus*, 737 F.2d 360, 362 (3d Cir. 1984) (area of stop and pat-down had recently been victimized by 12 unsolved burglaries); *People v. Souza*, 885 P.2d 982, 984 (Cal. 1994) (stop lawful when officer described area of stop as a "high crime" area "known for burglaries and drug activities" and officer had recently make two arrests "in the exact area"); *State v. Dean*, 645 A.2d 634, 634-35 (Me. 1994) (stop lawful in

I think the circuit court was right in concluding that "if the state wants the Court to rely on a high-crime area theory in justifying a *Terry* pat down, there has to be a clear and specific record" documenting both the specific boundaries and the nature of the criminal activity in the area in question. Crime itself is obviously a variegated phenomenon. Some effort must be made to correlate the specific type of crime allegedly endemic to a particular area with the police officers' reasonable suspicion that an individual whom they intend to search is armed.

No such correlation was made here. I agree with Professor LaFave's conclusion that "[u]nspecific assertions that there is a crime problem in a particular area should be given little weight, at least as compared to more particular indications that a certain type of criminal conduct of the kind suspected is prevalent in that area."[2]

Even were I to accept the majority's designation of the place of the stop as a high crime area, "even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 334-35 n.2 (1990). The other factors cited by the majority in reaching its conclusion that the state had the requisite reasonable suspicion to search the defen-

---

uninhabited area patrolled at the request of its owners because of numerous complaints of vandalism); *State v. Valentine*, 636 A.2d 505, 505-06 (N.J. 1994) (pat-down lawful; officer who was personally familiar with area of stop as a high crime area stated that he had made more than 100 arrests in the area).

[2] 3 Wayne R. LaFave, *Search and Seizure* § 9.3(c), at 457 (2d ed. 1987).

dant for arms do not add up to such "reasonable individualized suspicion."

With reference to the defendant's allegedly erratic driving, the police officer conceded during the suppression hearing that the defendant violated no traffic ordinances and that nothing about the defendant's driving had triggered suspicion that he was engaged in criminal activity. Instead, the officer began trailing the defendant's car because of "a general sense of unease that [he] had because it was late at night and the car was driving in a way that [he] couldn't put [his] finger on." This testimony represents precisely the sort of "inchoate and unparticularized suspicion or 'hunch' " which is insufficient under *Terry* to trigger the requisite reasonable suspicion that a defendant is armed. *Terry*, 392 U.S. at 27. Such a hunch stands in marked contrast to the facts triggering reasonable suspicion in the *Williamson* case relied upon by the majority, in which the defendant's erratic driving evinced an obvious effort to evade the police. *State v. Williamson*, 58 Wis. 2d 514, 517-18, 206 N.W.2d 613 (1973).

I also question the majority's reliance on the officer's description of the defendant as nervous. While it is true, as the majority opinion notes, that the officer testified to the defendant's being more nervous than the usual person stopped by the police, his testimony indicates that he was neither fully sure that such a behavioral difference truly existed nor fully capable of articulating what it entailed.[3]

---

[3] Q: Now, Officer Mulock, not that this has ever happened, when I'm pulled over, I act a little nervous too. Is this anything—anymore unusual than the usual person stopped by the police?

    A:   I think so. Yes, it was.

    Q:   What was different about it?

The circuit court concluded that the defendant's nervousness was attributable to the fact that people with expired plates who cannot find their licenses "are often nervous." What the officer was observing, the circuit court stated, "was a person nervously trying to come up with their driver's license and thinking it's there and not being able to find it."

This finding of historical fact is entitled to greater deference from this court than it received in the majority opinion. As the majority opinion itself states, when this court reviews an order granting suppression, it must uphold the circuit court's findings of fact unless they are against the "great weight and clear preponderance of the evidence." *State v. Kiper*, 193 Wis. 2d 69, 79, 532 N.W.2d 698 (1995) (quoting *State v. Richardson*, 156 Wis. 2d 128, 137, 456 N.W.2d 830 (1990)).

The evidence in this record supports the inference which the circuit court expressly drew: that to the limited extent that the officer could describe how the defendant was "more nervous" than the average person stopped, his description—of someone "checking his pockets" "extremely fast"—suggests no more than the nervousness of the average person unable to produce a driver's license requested by a law enforcement officer. For the majority opinion to speculate as it does about other possible reasons for the defendant's nervousness is not only to read into the record facts which are not there, but also to ignore the deferential standard of review to which the circuit court's findings are entitled.

I acknowledge, as this court has previously stated, that there can be no litmus test concerning the quantum and nature of information necessary to constitute

A:   Just the look on his face. He just appeared nervous and the way he was checking his pockets. He was doing it extremely fast.

the "specific and articulable facts" necessary to trigger the "reasonable suspicion" that a defendant is armed as required by *Terry* and its progeny. *State v. Guzy*, 139 Wis. 2d 663, 676, 407 N.W.2d 548 (1987). And I also recognize that a concatenation of factors individually consistent with innocent behavior may, under particular facts and circumstances, give rise to the requisite reasonable suspicion which *Terry* requires. *Reid v. Georgia*, 448 U.S. 438, 441 (1980); *State v. Jackson*, 147 Wis. 2d 824, 835, 434 N.W.2d 386 (1989).

Before a concatenation of factors individually consistent with innocent behavior can trigger reasonable suspicion, however, some degree of suspicion must attach to the specific acts which, when combined, add up to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 10 (1989). Hence in *Sokolow* itself, for example, which involved a stop rather than a pat-down frisk, the Court pointed to the fact that the respondent traveled under an alias, paid for two plane tickets costing $2100 with a roll of $20 bills, took a 20-hour flight from Honolulu to Miami but only stayed in Miami for 48 hours, and checked no luggage as among the factors triggering reasonable suspicion that the respondent was a drug courier and therefore justifying his brief detention.

But in this case, while the defendant's expired plates provided the officers with a reason to stop him, none of the factors relied upon by the majority warrants upholding the subsequent pat-down frisk. Neither the time of night, nor the undocumented assumption that an unspecified "area" was prone to crime, nor the defendant's manner of driving, nor the defendant's entirely understandable nervousness constituted behavior specifically and articulably related to

a reasonable suspicion that the defendant was armed and dangerous.

Consequently, these non-specific and non-individualized factors do not add up to the totality of circumstances justifying the requisite reasonable suspicion that the defendant was armed and dangerous. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *Brown v. Texas*, 443 U.S. 47, 51 (1981). Zero plus zero will always equal zero. To conclude otherwise is to lend significance to "circumstances [which] describe a very large category of presumably innocent travelers" and subject them to "virtually random seizures." *Reid*, 448 U.S. at 438.

One might try to justify the officers' actions in this case by hindsight. The officers' frisk produced a loaded gun. But hindsight does not satisfy the federal or state constitution. One might also try to justify the officers' actions in this case in the name of crime prevention and police protection. Crime prevention and police protection might well be served by allowing law enforcement officers to frisk everyone they stop. But the federal and state constitutions do not allow such frisks.

In contrast to the majority opinion, I agree with the circuit court's depiction of this case as a routine traffic stop. The defendant displayed no behavior to support a reasonable belief that he might be armed and dangerous. Therefore I conclude that the circuit court was correct when it suppressed the evidence.

For the reasons set forth, I dissent.